# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

```
-------------------------------------------------------------X
STEVEN GOODMAN, Individually and on          :
Behalf of All Other Persons Similarly Situated,  :
                                             :   CIVIL ACTION: 11-CV-4395 (JHR)(JS)
                    Plaintiffs,              :
                                             :
        -against-                            :
                                             :
BURLINGTON COAT FACTORY                      :
WAREHOUSE CORPORATION,                       :
BURLINGTON COAT FACTORY                      :
INVESTMENT HOLDINGS, INC.,                   :
and BURLINGTON COAT FACTORY                  :
HOLDINGS, INC.,                              :
                                             :
                    Defendants.              :
-------------------------------------------------------------X
```

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR FINAL CERTIFICATION OF FAIR LABOR STANDARDS ACT <u>COLLECTIVE ACTION</u>

Seth R. Lesser
Fran L. Rudich
Dudley G. Jordan
KLAFTER OLSEN & LESSER LLP
Two International Drive, Suite 350
Rye Brook, New York 10573
Tel:    (914) 934-9200
Fax:    (914) 934-9220

Michael A. Galpern
Andrew P. Bell
Neel D. Bhuta
LOCKS LAW FIRM, LLC
801 N. Kings Highway
Cherry Hill, New Jersey 08034
Telephone: (856) 663-8200
www.lockslaw.com

*Attorneys for Plainti*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION……………………………………………………………………………...1

I.    THE RECORD SHOWS THAT PLAINTIFFS' PRIMARY DUTIES ARE NON-EXEMPT AND MATERIALLY SIMILAR………………………………………...5

    A.    Burlington Operates Pursuant to Comprehensive Corporate Policies and Procedures………………………………………………………………...5

        1. Burlington Has Uniform Corporate Policies…………………………...5

        2. ASMs Operate Under Uniform Corporate Rules and Job Descriptions and are Evaluated the Same Way………………………………………7

        3. Burlington Maintains Uniform Training for All ASMs………………..8

        4. Burlington ASMs Have the Same Employee Compensation and Benefits and Are Uniformly Not Paid Overtime……………………...9

        5. Burlington Uniformly Classified All ASMs as Exempt………………9

    B.    Comprehensive Testimony Proves ASMs Are Similarly Situated………..9

    C.    Burlington's "State of Mind" Defenses Are Common…………………..23

II.    THE CLAIMS HERE SHOULD BE FINALLY CERTIFIED FOR TRIAL…………25

    A.    The FLSA Is a Remedial Statute to be Given Broad Application for Collective Actions to Vindicate Employees' Statutory Rights…………..25

    B.    Plaintiffs' Employment Settings Need Not Be Carbon Copies to Be "Similarly Situated"………………………………………………………...26

        1. ASMs' Factual and Employment Settings Are Substantially Similar…………………………………………………27

        2. Whether the Case Is Analyzed Under the Executive or Administrative Exemption, the Same Defenses Apply for All Plaintiffs………………...32

        3. Fairness and Procedure Favor Plaintiffs………………………………33

    C.    There Is No Issue In This Case As To Hours Worked…………………..34

CONCLUSION…………………………………………………………………………...35

## TABLE OF AUTHORITIES

### Cases

*Ahle v. Veracity Research Co.*, 738 F. Supp. 2d 896 (D. Minn. 2010)..........................................32

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946)..........................................35

*Andrako v. United States Steel Corp.*, 788 F. Supp. 2d 372, 383 (W.D. Pa. 2011).....................33

*Bell v. Citizens Fin. Group*, 2:10-cv-00320 (W.D. Pa.)...............................................................4

*Bradford v. Bed Bath & Beyond,* 184 F. Supp. 2d 1342 ( N.D. Ga. 2002 )...................................34

*Brock v. Wilamowsky,* 833 F. 2d 11 (2d Cir. 1987).........................................................................24

*Chabrier v. Wilmington Fin., Inc.,* 2008 U.S. Dist. LEXIS 27761 (E.D. Pa. Apr. 4, 2008) ........26

*Garcia v. Freedom Mortgage Corp*, 790 F. Supp. 2d 283 (D.N.J 2011)...............................26, 34

*Gayle v. Harry's Nurses Registry, Inc*., 2012 U.S. Dist. LEXIS 28157
   (E.D.N.Y. Mar. 1, 2012..............................................................................................................26

*Goodman v. Burlington Coat Factory*, 2012 U.S. Dist. LEXIS 166910
   (D.N.J. November 20, 2012)..........................................................................................2, 26, 28

*Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165 (1989)..........................................................25, 33

*Indergit v. 27 Rite Aid Corp.,* 2010 U.S. Dist. LEXIS 60202 (S.D.N.Y. June 15, 2010)............32

*Jacob v. Duane Reade, Inc.,* 289 F.R.D. 408 (S.D.N.Y. 2013) ........................................27, 29, 30

*Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43 (3d Cir. 1989)..........................................27

*Lusardi v. Lechner*, 855 F.2d 1062 (3d Cir. 1988) ......................................................................27

*Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 359 (D.N.J. 1987)......................................................27

*Martin v. Cooper Elec. Supply Co.,* 940 F.2d 896 (3d Cir. 1991)................................................24

*Martin v. Selker Bros.*, Inc., 949 F.2d 1286 (3d Cir. 1991) ........................................................35

*McLaughlin v. Richland Shoe Co.,* 486 U.S. 128 (1988)................................................................ 24

*McLean v. Garage Mgmt. Co. LLC,* 2012 U.S. Dist. LEXIS 55425 (E.D.N.Y. Apr. 19, 2012) .. 23

*Morisky v. Public Serv. Elec. & Gas Co.,* 111 F. Supp. 2d 493 (D.N.J. 2000) ........................... 26

*Morrison v. Ocean State Jobbers, Inc.,* 2013 U.S. Dist. LEXIS 40010
    (D. Conn. Mar. 22, 2013) ............................................................................................... 29, 34

*Moss v. Crawford & Co.,* 201 F.R.D. 398, 410 (W.D. Pa. 2000)................................................. 25

*Myers v. Hertz Corp.,* 624 F.3d 537 (2d Cir. 2010)....................................................... 3, 4, 26, 31

*Nerland v. Caribou Coffee Co., Inc.,* 564 F. Supp. 2d 1010 ( D. Minn. 2007) ............... 31, 33, 34

*Pendlebury v. Starbucks Coffee Company,* 518 F. Supp. 2d 1345 (S.D. Fla. 2007) ................... 34

*Perkins v. S. New Eng. Tel. Co.,* 669 F. Supp. 2d 212 (D. Conn. 2009)..................... 4, 29, 30, 34

*Reich v. Gateway Press, Inc.,* 13 F.3d 685 (3d Cir. 1994) .................................................... 32, 35

*Ruffin v. Avis Budget Car Rental, LLC,* 2014 U.S. Dist. LEXIS 9562
    (D.N.J. Jan. 27, 2014)...................................................................................................... *passim*

*Scott v. Aetna Servs.,* 210 F.R.D. 261 (D. Conn. 2002)............................................................... 29

*Stillman v. Staples, Inc.,* 2009 U.S. Dist. LEXIS 42247 (D.N.J. May 11, 2009) ................ *passim*

*Symczyk v. Genesis Healthcare Corp.,* 656 F.3d 189 (3d Cir. 2011) ........................................... 4

*Youngblood v. Family Dollar Stores, Inc.,* 2011 U.S. Dist. LEXIS 115389, 2011 WL 4597555
    (S.D.N.Y. Oct. 4, 2011)....................................................................................................... 29, 31

*Zanes v. Flagship Resort Dev., LLC,* 2012 U.S. Dist. LEXIS 22191
    (D.N.J. Feb. 22, 2012)................................................................................................................ 25

*Zavala v. Wal-Mart Stores, Inc.,* 691 F.3d 527 (3d Cir. 2012)......................................... 4, 26, 27

**<u>Statutes, Rules, and Regulations</u>**

29 U.S.C. § 216(b) ................................................................................................ *passim*

29 U.S.C. § 255(a) ................................................................................................ 23

Fed R. Civ. P. Rule 23 ......................................................................................... *passim*

29 C.F.R. § 541.100 ............................................................................................. 11

29 C.F.R. § 541.700 ............................................................................................. 11

## INTRODUCTION

In a moment of candor during one of the forty-plus depositions in this case, Fred Hand, Burlington Executive Vice President, admitted that

> Burlington saves millions of dollars a year by not paying overtime to any executive that works over 40 hours.

Hand (Ex. A) at 70.[1]  Plaintiffs believe that this one sentence expresses the simple explanation (saving money) behind Burlington Coat Factory Warehouse Corporation, Burlington Coat Factory Investment Holdings, Inc., and Burlington Coat Factory Holdings, Inc.'s, ("Burlington" or "Defendants") classification of its assistant store managers ("ASMs") as exempt.[2]  Burlington can in no way claim that it relied on any study, analysis or outside audit to determine that ASMs were properly classified, because it conducted no such study prior to this litigation.  *See* p. 12-14 *infra*.  In fact, the only internal study that Burlington conducted prior to this lawsuit showed that the ASMs observed spent upwards of 70% of their time on non-exempt, hourly tasks.  *See* p. 24-25 *infra*.  Perhaps this is why Mr. Hand, later in his deposition, admitted that it might be time for an outside agency, the Department of Labor or some other governmental agency to conduct an audit on whether the ASMs are in fact properly classified.  Hand (Ex. A) at 71-72, 251-52.

Plaintiff Steven Goodman ("Plaintiff" or "Goodman") submits this brief in support of his Motion for Final Certification of Fair Labor Standards Act ("FLSA") Collective Action

---

[1] Exhibits to the Declaration of Seth R. Lesser shall be referred to in the form "Ex. __ ". References to depositions will be cited by deponent last name, Lesser Declaration exhibit number, and relevant page number (*e.g.*, "Ansara (Ex. __ ) at __ ").

[2] There are presently two defined job positions at issue in this collective action:  what is now the customer services logistics manager ("CSLM") and what is now the merchandise manager ("MM") position.  The CSLM, combines what were previously two separately designated positions, those of operations manager and customer service manager.  Ansara (Ex. B) at 17-18, 21.  However, the titles of operations manager, CLSM and MM are all categorized as "assistant store manager" positions or "ASMs", which is the nomenclature used herein.

("Motion") on behalf of himself and the over 560 other current and former ASMs employed by Burlington. When granting first-stage conditional certification, this Court made the following findings based on the deposition testimony and corporate documents then before it:

- "All ASMs are subject to the same policies and procedures." Ansara (Ex. B) at 36-37, 42-47, 50-55; Ex. AS -AY.

- "Burlington creates an employee handbook, system of core values, code of business conduct, and ethics, and workplace rules and policies that apply to all Burlington employees regardless of the store's size, location or geographic region." *Id*.

- "The same job descriptions apply to all ASM positions across the Unites States, regardless of the store's location, size, or hours of operation and only one job description is in effect at any given time." Ansara (Ex. B) at 82-83, 89, 91, 93.

- "ASMs are subject to the same training requirements, as Burlington requires all new ASMs to attend a classroom –style training program, which is uniform throughout the country, and taught by a Burlington Regional Human Resource Director." *Id*. at 29-30.

- "Burlington also requires ASMs to complete computer-based e-learning modules an remain up to date through Burlington's internal intranet messaging system." *Id*. at 69-71; Ex. AQ.

- "Burlington Compensates all ASMs in the same manner and classifies all ASMs as exempt," and all ASMs "receive a fixed salary and they do not receive overtime compensation." *Id*. at 99; Ex. AR.

- "Burlington classifies all ASMs as exempt from the overtime requirements of the FLSA, regardless of the individual ASM's tenure, the ASM's supervisor or manager, or the store's location size, sales volume, hours of operation." *Id*. at 99-102.

*Goodman v. Burlington Coat Factory*, 2102 U.S. Dist. LEXIS 166910, at *9-10 (D.N.J. November 20, 2012). These conclusions have been emphatically supported since notice was sent out and 569 ASMs joined this case. Second-stage discovery, including representative discovery of the Opt-in Plaintiffs (together with the named Plaintiff, "Plaintiffs"), is now complete. After Burlington deposed thirty (30) Plaintiffs across the country, the record is clear that final collective action certification is appropriate for this archetypal FLSA misclassification collective

action.  The overwhelming evidence – from corporate documents and corporate admissions, to thirty (30) Plaintiffs' depositions – shows that those ASMs who joined this lawsuit spend the majority of their time performing substantially similar, non-exempt tasks, such as cleaning the store, cashiering, engaging in customer service, taking out the trash, fronting and stocking merchandise, and unloading trucks.  *Infra* at 9-12.  One Plaintiff explained, "I worked mostly as an hourly associate doing tasks that were – that associates should have been doing but it was considered my job."  Sadauskas (Ex. AC) at 190-91.  Another testified,

> [o]nce again, the reality of the floor in the Burlington Coat Factory, it doesn't give you the time to do all these things because there are never enough hourly associates on the floor to really do what you need to do. Therefore, most of my time during the day was spent doing markdowns, cashiering, putting merchandise away, emptying the stockroom, bringing rolling racks out onto the floor and putting them away, recovering.

Steinfeld (Ex. AG) at 122-23.  Another Plaintiff said, "[t]here was very little – I guess you could say very little independent thought on my part throughout the day.  I generally took orders from [my store manager]."  Haynes (Ex. S) at 67.  And a fourth said, "I don't get a chance to do my managerial job.  I don't.  I would love to – I would love to come in and delegate without hav[ing] to do it myself or have enough associates to get tasks done."  Ebbs (Ex. N) at 137.

The entirety of the record shows that Plaintiffs are similarly situated, and the much-cited decision by now-Circuit Judge Gerald Lynch in applying the more stringent Rule 23 standards to another misclassification lawsuit is fully applicable to this case:

> [T]o the extent that there are differences [among the testimony from the allegedly misclassified employees], there is no evidence that they are of such a magnitude as to cause individual issues to predominate.  Where, as here, there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies, district courts have routinely certified classes of employees challenging their classification as exempt, despite arguments about 'individualized' differences in job responsibilities.

*Damassia v. Duane Reade*, 250 F.R.D. 152, 160 (S.D.N.Y. 2008) (approvingly cited by *Myers v.*

3

*Hertz Corp.*, 624 F.3d 537, 549 (2d Cir. 2010)).[3]

As a whole, the evidence is undeniable that ASM job duties are, indeed, defined and controlled by comprehensive corporate policies and procedures – from a hierarchical reporting structure and corporate administration (*infra* at 5-6), to comprehensive centrally promulgated policies (*infra* at 6-7), to blanket job rules (*infra* at 7-8), to uniform training (*infra* at 8-9), to a common job description and performance review criteria (*infra* at 7-8), and, ultimately, to the replete testimony of Plaintiff after Plaintiff who testified to the fundamental similarities of the ASM job (*infra* at 9-23).  Without even seeing Burlington's papers, Plaintiffs predict that it will assert the impossibility of trying an FLSA misclassification collective action, yet, such cases can be and are tried, and with verdicts for both sides.[4]  One of these leading trials, conducted in this Court, involved a materially identical misclassification collective action, *Stillman v. Staples, Inc.*, and in upholding the verdict, Judge (now-Circuit Judge) Patty Shwartz recognized that "the similarly situated standard of  § 216(b) of the [FLSA] does not require that plaintiffs be identical."  *Stillman v. Staples, Inc.*, 2009 U.S. Dist. LEXIS 42247, at *68 (D.N.J. May 11, 2009) (post-trial decision; quotation omitted); *accord Ruffin v. Avis Budget Car Rental, LLC*, 2014 U.S. Dist. LEXIS 9562, at *8 (D.N.J. Jan. 27, 2014) (denying decertification of similar position in misclassification FLSA collective action stating that "Plaintiffs do not need to be identical to be similarly situated for purposes of an FLSA collective action.").

Where, as here (and as in *Stillman* and *Ruffin*), employees' jobs are defined by corporate

---

[3] *Damassia* is regularly cited by district courts inside and outside the Second Circuit, and, as noted above, was cited approvingly in the Second Circuit's seminal *Myers v. Hertz* decision, which, in turn, was relied upon by the Third Circuit in both *Symczyk v. Genesis Healthcare Corp.*, 656 F.3d 189 (3d Cir. 2011), and *Zavala v. Wal-Mart Stores*, 691 F.3d 527 (3d Cir. 2012).

[4] *See, e.g., Morgan v. Family Dollar Stores*, 551 F.3d 1233 (11th Cir. 2008) (plaintiffs' verdict); *Perkins v. Southern New England Tel. Co. Inc.*, 3:07-00967, Dkt. No. 578 (D. Conn. Oct. 24, 2011) (defendant's verdict); *Bell v. Citizens Fin. Group*, 2:10-cv-00320 (W.D. Pa.) (same).

policies and the employees do materially the same (but not necessarily identical) job – *i.e.*, are "similarly situated" – final certification and a collective action trial makes judicial sense. The alternative – decertification – will either lead to (1) scores of claims being re-filed as related actions to the claims of the named Plaintiff (and effectively the same case will be tried again and again and again), or (2) claims will simply be lost. Such an outcome hardly constitutes justice, and would impose substantial time and expense on both the employees and judiciary. *Infra* at 33-34 (addressing this point). Therefore, for the reasons more fully discussed below, this Court should grant Plaintiffs' Motion for Final Certification.

## I.    THE RECORD SHOWS THAT PLAINTIFFS' PRIMARY DUTIES ARE NON-EXEMPT AND MATERIALLY SIMILAR

### A.    Burlington Operates Pursuant to Comprehensive Corporate Policies and Procedures

As Judge Lynch wrote in *Damassia*, when the job at issue in an FLSA collective action is defined by comprehensive corporate policies and procedures, strong indicia of propriety of an aggregate proceeding exist, a determination that numerous decisions have followed. 250 F.R.D. at 160; *see also* cases cited *infra* at 27-32. Here, there is an overwhelming plethora of such evidence, indeed more than existed in *Damassia* (in which the undersigned was class counsel).

#### *1.    Burlington Has Uniform Corporate Policies*

Burlington runs its stores through a hierarchical system subject to centrally derived, corporately created policies in which Burlington's corporate headquarters directs the company from the top down. In his deposition, Burlington's corporate representative, Louis Ansara, explained that the content of these guidelines and operating procedures distributed to all store locations are the same throughout the country. Ansara (Ex. B) at 50-52; 70-73 (testifying that Burlington corporate sends uniform correspondence to their stores via the company intranet called "portal.coat.net" as well as through "store action planners"). Mr. Ansara further testified

5

about the mandatory uniformity of store operations (regardless of store location, size, staffing, or any other variable) stating that the "guideline[s]…tell you what you can and can't do." *Id*. at 52. Mr. Ansara's testimony was corroborated by other corporate witnesses. For example, Rebecca Hubbard, market human resources manager, testified that Burlington corporate dictates the products that will be sold in a store as well as how they will be displayed. Hubbard (Ex. D) at 189-90. Susan Hilton, vice president of store expense and scheduling, testified that she made the schedules for each store, using corporate workforce management system technology, and controlled the amount of hourly payroll that each store was allocated. Hilton (Ex. F) at 22-32.

Burlington mandates uniformity in operations to the smallest level of detail and issues manuals with operating and training policies that apply unvaryingly at all locations nationwide ranging from how to make change out of a cash drawer, to the required contents of a customer service desk, to the width of each isle. *Id*. at 50-55; *see, e.g*., Ex. AV (Burlington Coat Factory, Standard Operating Procedures) at BCF000895, Ex. AW (Burlington Coat Factory Store Guidelines) at BFC002131 and Ex. AX (Burlington Coat Factory General Merchandising Guidelines) at BCF003406. Furthermore, Burlington requires strict adherence to its corporate policies which severely curtails any independent discretion ASMs might otherwise have. For example "**Store associates or manager are not authorized to contact police or local law enforcement agencies about suspected shoplifting incidents without first consulting with Loss Prevention.**" Ex. AY (Burlington Coat Factory Manager's Loss Prevention Guide) at BCF1050 (emphasis in original). Assistant store managers do not even have the ability to decide how and where to install hand sanitizer machines in their stores. Ex. AV (Burlington Coat Factory, Standard Operating Procedures) at BCF1050.

In addition to these policies, corporately derived guidelines provide significant detail on

6

how Burlington's stores should be presented and maintained.  For example, Burlington's General

Merchandise Guidelines, written by their visual merchandising team, store planning team and

loss prevention team (all corporate departments), is a guideline for Burlington stores across the

United States.  Ansara (Ex. B) at 61-63; *see also* Ex. AX, Burlington's General Merchandise

Guidelines.  In order to ensure such policies are uniformly implemented in the stores,

Burlington's corporate headquarters  requires that all ASMs undergo standardized training

addressing a diverse range of issues.  *See* Ansara (Ex. B) at 29-32, 57-58; *see also* various

learning modules (Ex. AQ) addressing issues such as vacuuming schedules, ticketing, name

badges, risk control, register coverage, and proper advertising placement.

Therefore, Burlington's own documents demonstrate that its ASMs operate under, and

pursuant to, uniform corporate policies and procedures.

## 2.    *ASMs Operate Under Uniform Corporate Rules and Job Descriptions and are Evaluated the Same Way*

Burlington's corporate headquarters disseminates all work rules and procedures that

apply to all ASMs throughout the entire organization regardless of the size, location or region in

which they work.  For instance, Burlington creates one employee handbook for ASMs

nationwide.  Ansara (Ex. B) at 36-37, 42-47; Ex. AS (Burlington Coat Factory Employee Policy

Handbook).  Burlington corporate headquarters also generates a system of core values (Ex. AT

(Burlington, the Heart of Success Core Values)), and a code of business conduct and ethics (Ex.

AU (Burlington Coat Factory Warehouse Corporation Code of Business Conduct and Ethics))

which together detail standards and principles to which all ASMs must adhere at all Burlington

stores nationwide.  Ansara (Ex. B) at 36-37, 42-47.

As referenced above in note 2, Burlington has two categories of ASMs: CLSM and MM.

For all locations, Burlington considers the ASM position to be the same such that it created one

job description for each category of ASM.  By virtue of these uniform job descriptions,

Burlington identically classifies the ASMs in terms of purpose, responsibilities, required skills

and requirements for the job titles across the United States.  *See* Ex. AL (Job Description for

Operations Manager); Ex. AM (Job Description for Operations Assistant Store Manager); Ex.

AN (Job Description for Customer Service Logistics Manager); Ex. AO (Former Merchandise

Assistant Store Manager Job Description); Ex. AP (Current Merchandise Assistant Store

Manager Job Description); Ansara (Ex. B) at 83, 85-89, 91, 93 (confirming description applies to

all ASMs regardless of location). Louis Ansara, the designated Rule 30(b)(6) corporate

representative, confirmed that every ASM across the United States receives the same uniform job

description outlining their alleged essential duties and responsibilities in all retail locations.

Ansara (Ex. B) at 93.  As demonstrated below, the deposition testimony of the named plaintiff

and the opt-ins confirm that the duties of ASMs are the same.  *See* relevant testimony *infra* at 9-

23.  Consistent with Burlington's uniform job description regime, all ASMs undergo the same

corporately-derived annual performance review process.  *Id.* at 32-33, 99.

### 3.    *Burlington Maintains Uniform Training for All ASMs*

Burlington's corporate headquarters generates one set of uniform training materials for

all ASMs nationwide.  Ansara (Ex. B) at 28-29, 37, 39.   Burlington's Learning and

Organizational team developed a two-to-four week program of  "e-learning" modules that all

new ASMs are required to complete.  Asnsara (Ex. B) at 60, 69-71; *see also,* Ex. AQ (e-learning

modules).  All ASMs are able to access these standardized training tools (described by Mr.

Ansara as Burlington's "primary company communication document") through any Burlington

computer terminal, regardless of the location in which they work.  *Id.*  Burlington also conducts

classroom style training for new ASMs which is led by the Regional Human Resource Director

which is, again, the same throughout all of Burlington's stores in the United States.  *Id.* at 29-30.

### 4.    *Burlington ASMs Have the Same Employee Compensation and Benefits and Are Uniformly Not Paid Overtime*

All ASMs nationwide are paid a fixed salary, are entitled to the same benefits, and do not receive overtime compensation for any hours worked in excess of 40 in a workweek. Ansara (Ex. B) at 17, 99; Ex. AS (Burlington Coat Factory Employee Policy Handbook) at BCF10; Ex. AR (Burlington Salary Guidelines Brochure).

### 5.    *Burlington Uniformly Classified All ASMs as Exempt*

Burlington, without exception, classifies all ASMs as exempt with no regard to the size, sales volume, geographic location or hours of operation of the store where the ASM works; the ASM's tenure; the sales impact of any of Burlington's competitors; or the supervisor or manager to whom the ASM reports.  Ansara (Ex. B) at 99-102.

### B.    Comprehensive Testimony Proves ASMs Are Similarly Situated

Burlington classifies all ASMs as exempt without taking into account (1) store size, (2) store sales volume, (3) store location, (4) the ASMs' tenure with Burlington, (5) the ASMs' experience, (6) the hours of operation, or (7) the Store Manager ("SM") that supervises the ASM.  *Id*.  The classification policy is a unitary one.  There are no exceptions based on the duties ASMs actually may (or what Burlington believes they) perform.

The full record now supports Burlington's corporate representative's testimony that the duties and responsibilities of all ASMs are materially the same throughout the company.  The thirty (30) depositions of the representative Plaintiffs working at Burlington stores nationwide prove this.  Plaintiffs' testimony has shown that ASMs spend the majority of their time engaged in non-exempt, manual labor, and customer-service related tasks within the confines of Burlington's policies and procedures, such as:

9

- Stocking and fronting, and recovering merchandise;[5]
- Cashiering;[6]
- Engaged in customer service;[7]
- Unloading trucks;[8]

---

[5] Anneau (Ex. H) at 105, 163, 246, 247 (stocked and put merchandise on floor); Ball (Ex. I) at 37-38, 64-66, 170, 172-73 (moves merchandise from back to front and puts on displays); Casey (Ex. J) at 199; Chimezie (Ex. K) at 52, 53, 126, 150, 154-57, 164 (builds displays, stocks shelves, and stacks merchandise); Currie (Ex. L) at 73, 75, 110, 136, 145, 185, 214, 215, 217-20 (would bring rolling racks out to floor and stack racks); Dant (Ex. M) at 202; Ebbs (Ex. N) at 58, 59, 76, 93, 127-29, 108-109, 120-23, 161-62 (moving fixtures, making moves, taking down walls, performing recovery); Fortenberry (Ex. O) at 114; Goodman (Ex. P) at 296; Harris (Ex. Q) at 148; Harrison (Ex. R) at 39, 42, 84, 85, 133-35 (moving walls and setting up areas to be re-merchandised); Haynes (Ex. S) at 156; Johnson (Ex. T) at 22, 94, 131, 158 (tagged and put sensors on clothing); Kawa (Ex. U) at 73; Knight (Ex. V) at 182, 183;  Koleva (Ex. W) at 17, 109, 110, 131 (spends 15-30 hours per week stocking merchandise); LaMaster (Ex. X) at 30, 32, 182, 183; Layne (Ex. Y) at 247; Le (Ex. Z) at 167; Melendez (Ex. AA) 37, 68, 69, 72-75, 78-80, 216, 301-303 (spent 4-5 hours every morning merchandizing the floor); Murillo (Ex. AB) at 155-56; Sadauskas (Ex. AC) at 80, 83, 187, 188, 196 (unpack, sensor and hang clothes, stocking shelves, sorted merchandise); Sandhu (Ex. AD) at 31, 145 (pushed merchandise out to floor and put it on the racks); Schmersal (Ex. AE) at 144; Singson (Ex. AF) at 138-42; Steinfeld (Ex. AG) at 30-32, 57, 96, 97, 122, 123, 183-87, 189, 190, 194, 195 (putting stock away, pulling merchandise out of the back, colorizing and sizing); Taylor (Ex. AH) at 34, 148-50;Tucker (Ex. AI) at 61, 111-14; Young (Ex. AJ) at 40, 87, 134, 135; Wilson (Ex. AK) at 69.

[6] Anneau (Ex. H) at 109-13, 224, 247; Ball (Ex. I) at 170; Casey (Ex. J) at 179, 200; Chimezie (Ex. K) at 154, 155; Currie (Ex. L) at 213; Dant (Ex. M) at 148, 202; Ebbs (Ex. N) at 115, 120, 121, 160; Fortenberry (Ex. O) at 113; Goodman (Ex. P) at 146; Harris (Ex. Q) at 101, 148, 149; Harrison (Ex. R) at 58, 59, 133; Haynes (Ex. S) at 155; Johnson (Ex. T) at 159; Kawa (Ex. U) at 73, 146; Knight (Ex. V) at 182; Koleva (Ex. W) at 17, 104, 131; LaMaster (Ex. X) at 181; Layne (Ex. Y) at 186, 252; Le (Ex. Z) at 96, 167; Melendez (Ex. AA) 37, 144, 145, 149, 301; Sadauskas (Ex. AC) at 187; Sandhu (Ex. AD) at 145; Schmersal (Ex. AE) at 120, 142; Singson (Ex. AF) at 138-42; Steinfeld (Ex. AG) at 171, 172; Taylor (Ex. AH) at 34, 148; Tucker (Ex. AI) at 110, 111; Young (Ex. AJ) at 134.

[7] Anneau (Ex. H) at 162, 228, 246; Ball (Ex. I) at 37, 38; Casey (Ex. J) at 199; Chimezie (Ex. K) at 150; Currie (Ex. L) at 213; Ebbs (Ex. N) at 93, 108, 109, 120, 121, 135, 161; Fortenberry (Ex. O) at 113; Goodman (Ex. P) at 148; Harris (Ex. Q) at 148; Harrison (Ex. R) at 134; Haynes (Ex. S) at 22, 140; Johnson (Ex. T) at 88, 143, 158; Knight (Ex. V) at 182; Koleva (Ex. W) at 105, 131; LaMaster (Ex. X) at 181; Le (Ex. Z) at 167; Melendez (Ex. AA) 180; Sadauskas (Ex. AC) at 187; Sandhu (Ex. AD) at 100, 145; Singson (Ex. AF) at 138-42; Steinfeld (Ex. AG) at 30, 96, 97, 122, 123, 132, 171, 172, 183, 184, 194, 195; Taylor (Ex. AH) at 148; Tucker (Ex. AI) at 111; Young (Ex. AJ) at 40, 134; Wilson (Ex. AK) at 93, 94.

[8] Anneau (Ex. H) at 99, 100, 102-104 (had to process new freight and unload (had to process new freight and unload for 50-70% of the day when a truck came in); Ball (Ex. I) at 173 (unloaded boxes from trucks onto conveyor belts 4-5 times per week); Casey (Ex. J) at 179, 200; Chimezie (Ex. K) at 132, 155 (pulled racks for unloading); Currie (Ex. L) at 75, 185, 213 (unloaded trucks in the morning); Ebbs (Ex. N) at 161;

- Cleaning the stores;[9] and
- Taking out trash;[10]

These are, paradigmatically, tasks performed by non-exempt, hourly associates.

No less significantly, Plaintiffs consistently testified that they spent the majority of their time performing these non-managerial duties and thus, cannot qualify under the FLSA's executive exemption because their primary duty is not management. 29 C.F.R. §§ 541.100, 541.700. For instance, Plaintiff Steinfeld testified that he performed non-managerial work 85-90% of the time, and explained that "I personally did the tasks in the departments that had to be done to comply with the Task Manager deadline . . . based on the fact that there were not enough

Fortenberry (Ex. O) at 113; Goodman (Ex. P) at 154, 155, 297; Harris (Ex. Q) at 101, 148, 149; Harrison (Ex. R) at 134; Haynes (Ex. S) at 60, 93, 144, 155, 168; Johnson (Ex. T) at 22, 60, 159 (had to unload trucks 2-3 times per week); Kawa (Ex. U) at 73, 146; Knight (Ex. V) at 183; LaMaster (Ex. X) at 30, 181, 182; Layne (Ex. Y) at 119, 186, 247; Le (Ex. Z) at 146, 167; Melendez (Ex. AA) 37, 222, 224, 302 (5-10 hours per week unpacking boxes off of trucks); Sadauskas (Ex. AC) at 187; Sandhu (Ex. AD) at 32, 146 (pushed out new freight from the tucks and processed it); Schmersal (Ex. AE) at 144; Singson (Ex. AF) at 138-42; Taylor (Ex. AH) at 69, 149; Tucker (Ex. AI) at 111; Young (Ex. AJ) at 40, 113, 134; Wilson (Ex. AK) at 179.

[9] Anneau (Ex. H) at 113, 247; Ball (Ex. I) at 65, 66, 172 (cleans sales floor, sweeps inside and outside, cleans break rooms, vacuums, cleans mirrors, cleans front doors); Casey (Ex. J) at 200; Chimezie (Ex. K) at 154, 155; Currie (Ex. L) at 73, 110 (cleans up store and break rooms as part of closing); Ebbs (Ex. N) at 120, 134, 135, 142, 161 (sweeps the floor, cleans fitting room, cleans up messes on the floor); Fortenberry (Ex. O) at 114; Goodman (Ex. P) at 150, 296; Harris (Ex. Q) at 149; Harrison (Ex. R) at 82, 85, 134, 135; Haynes (Ex. S) at 156 (cleaned the store); Johnson (Ex. T) at 144, 158 (cleaned floors when there was a spill, including vomit, cleaned bathrooms, dusted fixtures); Knight (Ex. V) at 183; Koleva (Ex. W) at 107, 133 (cleaned bathrooms and swept floors); LaMaster (Ex. X) at 68, 182; Layne (Ex. Y) at 247; Le (Ex. Z) at 168, 176 (swept floors); Melendez (Ex. AA) 76, 153, 222, 223, 302 (spent about 10 hours per week cleaning store); Murillo (Ex. AB) at 159; Sadauskas (Ex. AC) at 188; Sandhu (Ex. AD) at 31, 146 (got on knees to clean fixtures, cleaned bathrooms); Schmersal (Ex. AE) at 144 (cleaned the store); Singson (Ex. AF) at 138-42; Steinfeld (Ex. AG) at 56, 133, 171; Taylor (Ex. AH) at 34, 149; Tucker (Ex. AI) at 112, 116; Young (Ex. AJ) at 135; Wilson (Ex. AK) at 96, 97.

[10] Anneau (Ex. H) at 122, 133 (spends up to 2 hours per week taking out the trash); Ball (Ex. I) at 65, 66, 170, (takes out trash as part of opening); Casey (Ex. J) at 199; Currie (Ex. L) at 185, 213, 215, 216; Goodman (Ex. P) at 298; Harris (Ex. Q) at 148; Johnson (Ex. T) at 161, 162; Layne (Ex. Y) at 247; Le (Ex. Z) at 167; Melendez (Ex. AA) 225, 226; Murillo (Ex. AB) at 158; Wilson (Ex. AK) at 179.

employees in that department to do it."  Steinfeld (Ex. AG) at 95, 187.  Plaintiff Ball stated that there were "never enough" staff and that she "constantly communicated" to her store manager about this shortage.  Ball (Ex. I) at 65, 66, 137-38, 143.  As a result, Plaintiff Ball testified that 4 out of 5 days of the week, she had to spend all day doing "task oriented" hourly work.  *Id*. at 169-71, 183.  Plaintiff Harrison explained that she was working "all these hours" but had no one to delegate to and candidly admitted that "it felt very much like being set up to fail or being given a list, a job description and having your hands tied behind your back."  Harrison (Ex. R) at 141.  The other Plaintiffs likewise concurred.[11]

If fact, Burlington knew that its ASMs spent a significant amount of time performing hourly tasks.  In 2010, Burlington engaged the Axsium Group to perform a study, the purpose of which was to "understand a day in the life of Burlington Coat Factory Associates" (the "Axsium

---

[11] Anneau (Ex. H) at 229-41, 248 (85-90% of time spent on hourly tasks); Ball (Ex. I) at 169-71, (80% of day spent on hourly tasks); Casey (Ex. J) at 201 (75-80% on hourly duties); Chimezie (Ex. K) at 157-158 (70-80% of time spent on hourly tasks); Currie (Ex. L) at 220-221 (spent 75-80% of his week on hourly duties); Dant (Ex. M) at 203 (spends 90% of her time on hourly tasks); Ebbs (Ex. N) at 166-76 (80% of her time spent on hourly tasks); Fortenberry (Ex. O) at 115 (85% hourly); Goodman (Ex. P) at 151 (80-90% of time spent on hourly duties); Harris (Ex. Q) at 150 (75% hourly tasks); Harrison (Ex. R) at 135 (performed hourly tasks 75-80% of the time); Haynes (Ex. S) at 145 (80-90% of time spent on hourly tasks); Johnson (Ex. T) at 162 (90% hourly); Kawa (Ex. U) at 147 (spent 95% of her time performing hourly duties); Knight (Ex. V) at 184 (90% hourly); Koleva (Ex. W) at 17 (spends 85-90% of her time performing hourly tasks); LaMaster (Ex. X) at 184 (80% spent on hourly tasks); Layne (Ex. Y) at 186-89 (80% of her work was the same as the hourly associates); Le (Ex. Z) at 169 (80-90% of time is on hourly tasks); Murillo (Ex. AB) at 155-56 (spends 90% of his time performing hourly tasks); Sadauskas (Ex. AC) at 188-89 (80% of time on hourly tasks); Sandhu (Ex. AD) at 33 (does associate work 85% of the time); Schmersal (Ex. AE) at 142 (spends 70% of his day on hourly tasks); Singson (Ex. AF) at 65, 138 (spent 75-80% of her time doing what the hourly associates did); Steinfeld (Ex. AG) at 187 (85-90% of time spent on hourly tasks); Tucker (Ex. AI) at 113 (spent 66% of his time on hourly tasks); Young (Ex. AJ) at 135 (75% of her shift was spent on hourly tasks); Wilson (Ex. AK) at 69, 70 (90% of her time spent on hourly tasks).

Study")[12].  Armstrong (Ex. E) at 172-74.  The data collected during the Axsium Study indicated

that the ASMs that were included in the study only spent 21% of their time "managing and

leading."  *Id.* at 278-80.  Based on this data, David Armstrong, Burlington's Director of Store

Initiatives, recommended that ASMs must "significantly reduce the time spent on tasks and

spend more time and focus leading."  *Id.* at 281.  However, despite this recommendation, until

this lawsuit was filed, Burlington did nothing to investigate the validity of such findings or to

determine whether ASMs spent upwards of 80% of their time on hourly tasks.  Armstrong (Ex.

E) at 355-56 (Armstrong was unaware of Burlington implementing any changes as a result of the

Axsium Study); Hubbard (Ex. D) at 293 (unaware of Burlington doing anything to verify that

ASMs job performance matches their job descriptions); Hilton (Ex. F) at 101-102 (has never

gone to any store or analyzed any documents to determine an ASM's primary duty); Hand (Ex.

A) at 71-72, 251-52 (Hand, Executive Vice President and Burlington, agreed that it might be the

right thing to do to have an outside agency, the Department of Labor or some other governmental

agency conduct an audit to determine if ASMs are properly classified as exempt); Escoto-Reyes

(Ex. G) at 73-79, 102-104 (Escoto-Reyes, Regional Human Resources Mananger for Burlington,

has never reviewed ASMs' daily tasks or performance reviews for the purpose of determining

proper exempt classification); Chambrelli-Hine (Ex. C) at 56-57 (Burlington designated

corporate representative Chambrelli-Hine testified that no one at Burlington had ever tried to

determine how ASMs actually spend their time).  Accordingly, despite the fact that the only

---

[12] The Axsium Study was commissioned with four separate objectives; was not a statistically based study; studied both exempt and non-employees; and did not include a representative sample of Burlington stores or employees.  Armstrong (Ex. E) at 110-19, 162, 203-12.  In addition, the Axsium study did not study the opt-ins, which are as discussed below at p. 26, the only legally relevant population of ASMs in this matter.  Accordingly, Plaintiffs are in no way arguing that the results of the Axsium Study can be extrapolated to the daily duties of the opt-in ASMs in this case.  Rather, Plaintiffs offer the results of the Axsium Study as yet another data point that shows that ASMs' primary duty is non-managerial.

study on record showed that the ASMs that were studied spent approximately 80% of their time on non-managerial tasks, Burlington simply ignored Mr. Armstrong's recommendation, and was content to proceed with the status quo of ASMs performing mainly hourly tasks.

Not only do ASMs primarily perform hourly tasks, but ASMs also have little input into – and cannot deviate from – most corporate decisions or decisions of their immediate supervisors. For example, ASMs cannot ultimately or rarely decide:

- To approve vacation or overtime for hourly employees;[13]
- To unilaterally discipline hourly employees;[14]
- To train hourly employees;[15]

---

[13] Anneau (Ex. H) at  67, 68; Ball (Ex. I) at 103; Chimezie (Ex. K) at 103, 116, 117; Currie (Ex. L) 203-205; Dant (Ex. M) at 173, 192; Fortenberry (Ex. O) at 88; Goodman (Ex. P) at 293; Harrison (Ex. R) at 72; Haynes (Ex. S) at  68; Kawa (Ex. U) at 56; Layne (Ex. Y) at 223; Melendez (Ex. AA) at 204; Murillo (Ex. AB) at 65, 169; Sadauskas (Ex. AC) at 97, 98; Schmersal (Ex. AE) at 88; Singson (Ex. AF) at 92; Steinfeld (Ex. AG) at 119, 120; Tucker (Ex. AI) at 72, 73; Wilson (Ex. AK) at 173.

[14] Anneau (Ex. H) at 149, 150 (warnings had to be approved by the SM); Ball (Ex. I) at 81 (HR or SM must always sign off); Casey (Ex. J) at 170-72; Chimezie (Ex. K) at 92 (never disciplined an employee); Currie (Ex. L) at 164, 166, 167, 170 (never initiated discipline and HR or SM had final say); Dant (Ex. M) at 41, 191 (never initiated discipline; discipline came from SM); Ebbs (Ex. N) at 87, 88 (only disciplined when told to do so); Fortenberry (Ex. O) at 84 (SM decides whether to issue discipline); Goodman (Ex. P) at 288, 289; Harris (Ex. Q) at 98, 99 (all discipline, even verbal warnings, had to be approved by the SM); Harrison (Ex. R) at 58, 118 (all discipline had to go through the SM); Haynes (Ex. S) at 22, 116 (could not write employees up without approval); Johnson (Ex. T) at 70, 71, 112 SM would tell her what to put in all write-ups); Kawa (Ex. U) at 99; Knight (Ex. V) at 165 (only issued discipline at the direction of her SM); LaMaster (Ex. X) at 141, 142 SM always instructed her to discipline associates); Layne (Ex. Y) at 114, 129, 161 (had to have SM approval to write-up an employee); Le (Ex. Z) at 78 (needed SM approval before disciplining an employee); Melendez (Ex. AA) at 195, 196, 242 (could not issue a write up with out the SM's approval); Sadauskas (Ex. AC) at 114, 126, 127, 185, 186 (never personally disciplined an employee); Schmersal (Ex. AE) at 142 (was not allowed to write an employee up without approval); Steinfeld (Ex. AG) at  150-53 (all discipline had to be ok'd by the SM); Taylor (Ex. AH) at 112 (only issued discipline when directed to do so by the SM); Tucker (Ex. AI) at 63, 97; Young (Ex. AJ) at 55, 58, 71, 72, 82 (could not initiate discipline without HR or SM's approval); Wilson (Ex. AK) at 52.

[15] Ball (Ex. I) at 61, 62, 179 (most training done online); Casey (Ex. J) at 62 ("seldomly" trained associates); Chimezie (Ex. K) at 65, 66, 142, 143 (never conducted orientation and only "rarely" trained associates); Currie (Ex. L) at 211 (most training done through computers); Ebbs (Ex. N) at 59, 60 93 (does not have time to train associates because of all the hourly tasks she does); Fortenberry (Ex. O) at 39, 97 (associates would train by "shadowing" other associates); Harris

- To hire hourly employees;[16]
- To unilaterally schedule hourly employees;[17]
- To terminate hourly employees;[18]

---

(Ex. Q) at 146 (hourly associates trained other associates); Johnson (Ex. T) at 40, 89 (did not train); Kawa (Ex. U) at 53, 125 (too busy to train); Knight (Ex. V) at 77 (did not train); LaMaster (Ex. X) at 121 (the computer would handle training); Layne (Ex. Y) at 302; Le (Ex. Z) at 111, 112 (only spent 1-2 hours throughout his entire employment training); Melendez (Ex. AA) 245; Murillo (Ex. AB) at 40-42, 107 (associates trained on their own); Sadauskas (Ex. AC) at 124, 125 (did not train); Sandhu (Ex. AD) at 68 (did not train); Schmersal (Ex. AE) at 56 (associates trained other associates); Singson (Ex. AF) at 65 (same); Steinfeld (Ex. AG) at 91, 120, 125, 126 (did not train); Taylor (Ex. AH) at 97, 98 (just made sure associates had the computer log-in for training); Tucker (Ex. AI) at 42, 43 (trained "not often"); Young (Ex. AJ) at 43 (associates usually trained other associates); Wilson (Ex. AK) at 78, 80 (did not train).

[16] Anneau (Ex. H) at 246; Ball (Ex. I) at 50, 59 (has not hired any associates); Chimezie (Ex. K) at 44 (has not hired any associates); Dant (Ex. M) at 155, 157 (SM had final authority for hiring); Ebbs (Ex. N) at 88, 89 (same); Goodman (Ex. P) at 293; Johnson (Ex. T) at 151; Knight (Ex. V) at 120 (SM made the decision on who was hired); Melendez (Ex. AA) at 90-92 ("I never had a say-so as far as who got hired."); Murillo (Ex. AB) at 104 (SM would tell him who to hire); Sadauskas (Ex. AC) at 112; Schmersal (Ex. AE) at 33 (hiring was the SM's decision); Singson (Ex. AF) at 36, 60 (same); Steinfeld (Ex. AG) at 111, 112 (all hires were approved by the SM and HR); Taylor (Ex. AH) at 72 (same); Tucker (Ex. AI) at 37-39, 109 (he had no role in the hiring of associates during his time as an ASM); Young (Ex. AJ) at 42, 51 (even if she rejected a candidate, SM would do a second interview and make the final hiring decision).

[17] Anneau (Ex. H) at 139 (SM had to approve changes to the schedule); Ball (Ex. I) at 94, 100, 101, 177 (SM is responsible for scheduling); Casey (Ex. J) at 148 (did not schedule); Chimezie (Ex. K) at 105, 106 (schedule "depends on the direction" she gets from the SM or corporate); Currie (Ex. L) at 020, 203 (computer would automatically generate the schedules and the SM would "tweak" them from there); Dant (Ex. M) at 111, 119 (SM does the schedule); Ebbs (Ex. N) at 69, 103, 104, 124, 144 (SM is responsible for scheduling); Goodman (Ex. P) at 14, 34 (SM and district manager had to approve schedule); Harrison (Ex. R) at 71, 72 (all schedules were subject to the SM's approval); Haynes (Ex. S) at 32 (keyed in schedules that had already been created); Johnson (Ex. T) at 35 (was not allowed to touch the schedule); Kawa (Ex. U) at 113 (only the SM could alter the schedule); Knight (Ex. V) at 74 (never made edits to the schedule); Koleva (Ex. W) at 95 (she had no role in scheduling, only the SM did the schedule); LaMaster (Ex. X) at 43 (did not schedule); Layne (Ex. Y) at 198 (stopped working on the schedule because the SM constantly changed it); Le (Ex. Z) at 131 (SM had to approve all changes to the schedule to ensure store did not go over budget); Sadauskas (Ex. AC) at 76, 77 (she played no role in scheduling; it was the SM's responsibility); Sandhu (Ex. AD) at 86 (had no input on scheduling); Singson (Ex. AF) at 83 (did not schedule); Steinfeld (Ex. AG) at 102-104 (schedule was generated by the BEST system according to allotted payroll dollars); Taylor (Ex. AH) at 72 SM handled all edits); Young (Ex. AJ) at 64 (did not have authority to take associates off of the schedule); Wilson (Ex. AK) at 52.

[18] Ball (Ex. I) at 124 (cannot fire); Chimezie (Ex. K) at 117, 118 (has not terminated any employees); Currie (Ex. L) at 175, 176 (sometimes sat in on termination meetings but had no other role); Ebbs (Ex. N) at 101 (cannot fire); Fortenberry (Ex. O) at 91, 92 (never had any

- The dress code;[19]
- To close the store in bad weather;[20]
- The music or temperature in the store;[21]
- What products are sold in the store;[22]
- To plan, control, or set the store's labor budget;[23]
- The rate of pay for hourly associates;[24]
- Where to place signs in the store;[25]

---

involvement in terminations); Goodman (Ex. P) 293 (could not terminate); Harrison (Ex. R) at 122 (terminations had to go through regional HR); Haynes (Ex. S) at 59 SM had final authority for terminations); Kawa (Ex. U) at 155 (never terminated any employees); LaMaster (Ex. X) at 142 (had to have SM's approval); Layne (Ex. Y) at 212-16 (same); Melendez (Ex. AA) at 242 (cannot fire); Murillo (Ex. AB) at 105 SM or district manager would do terminations); Sadauskas (Ex. AC) at 115 SM did all terminations); Schmersal (Ex. AE) at 89 SM processed the terminations); Singson (Ex. AF) at 74-82 (could not terminate an employee); Taylor (Ex. AH) at 117 (never even recommended that an employee be fired); Tucker (Ex. AI) at 75 (did not have the authority to terminate employees); Wilson (Ex. AK) at 173, 174 (could not terminate).

[19] Steinfeld (Ex. AG) at 175 (dress code was set out in the employee handbook); Young (Ex. AJ) at 45 (dress code explained in employee handbook).

[20] Ball (Ex. I) at 175; Sandhu (Ex. AD) at 148.

[21] Goodman (Ex. P) at 294; Murillo (Ex. AB) at 170, 171; Sandhu (Ex. AD) at 148; Wilson (Ex. AK) at 175.

[22] Anneau (Ex. H) at 249; Ball (Ex. I) at 175; Casey (Ex. J) at 202; Currie (Ex. L) at 224; Dant (Ex. M) at 205; Ebbs (Ex. N) at 163; Fortenberry (Ex. O) at 116; Goodman (Ex. P) at 290; Harris (Ex. Q) at 131, 150; Harrison (Ex. R) at 137; Haynes (Ex. S) at 158; Johnson (Ex. T) at 164; Kawa (Ex. U) at 154; Knight (Ex. V) at 185; LaMaster (Ex. X) at 184; Layne (Ex. Y) at 306; Le (Ex. Z) at 170; Melendez (Ex. AA) at 303; Murillo (Ex. AB) at 166; Sadauskas (Ex. AC) at 190; Sandhu (Ex. AD) at 148; Schmersal (Ex. AE) at 127, 145, 146; Steinfeld (Ex. AG) at 191; Tucker (Ex. AI) at 113; Young (Ex. AJ) at 136; Wilson (Ex. AK) at 172.

[23] Ball (Ex. I) at 108, 109; Casey (Ex. J) at 57, 58; Chimezie (Ex. K) at 107; Currie (Ex. L) at 206, 208; Fortenberry (Ex. O) at 27; Goodman (Ex. P) at 293; Harris (Ex. Q) at 93; Harrison (Ex. R) at 73; Haynes (Ex. S) at 148; Johnson (Ex. T) at 165; Kawa (Ex. U) at 55; LaMaster (Ex. X) at 43; Melendez (Ex. AA) at 300, 301; Murillo (Ex. AB) at 48, 168, 169; Sadauskas (Ex. AC) at 79, 109; Schmersal (Ex. AE) at 31, 101; Steinfeld (Ex. AG) at 192, 193; Singson (Ex. AF) at 112; Taylor (Ex. AH) at 48; Tucker (Ex. AI) at 114, 115; Young (Ex. AJ) at 133; Wilson (Ex. AK) at 88.

[24] Goodman (Ex. P) at 293; Johnson (Ex. T) at 36; Melendez (Ex. AA) at 100; Murillo (Ex. AB) at 46; Sandhu (Ex. AD) at 61; Wilson (Ex. AK) at 174.

[25] Anneau (Ex. H) at 249; Ball (Ex. I) at 176; Casey (Ex. J) at 202; Currie (Ex. L) at 224, 225; Fortenberry (Ex. O) at 116; Goodman (Ex. P) at 294; Harris (Ex. Q) at 150; Harrison (Ex. R) at 137; Haynes (Ex. S) at 85; Johnson (Ex. T) at 164; Knight (Ex. V) at 185; LaMaster (Ex. X) at 184; Layne (Ex. Y) at 307; Le (Ex. Z) at 170; Melendez (Ex. AA) 303, 304; Sadauskas (Ex. AC) at 190; Sandhu (Ex. AD) at 148; Schmersal (Ex. AE) at 146; Singson (Ex. AF) at 142; Steinfeld

- The performance reviews of hourly employees;[26] and
- The prices to charge for products sold in the stores.[27]

Burlington's designated corporate representative, Lisa Chambrelli-Hine, corroborated much of

the ASM's testimony above.  *See, e.g.*, Chambrelli-Hine (Ex. C) at 171 (do not plan, control or

set store labor budgets), 172 (do not set the rate of pay for hourly associates), 173 (do not set the

dress code), 174 (cannot close the store in bad weather), 175 (cannot decide what music to play

in the stores), 177 (cannot decide the merchandise to be sold or set prices), 234 (tasks must be

---

(Ex. AG) at 188, 189; Taylor (Ex. AH) at 151; Tucker (Ex. AI) at 113; Young (Ex. AJ) at 136; Wilson (Ex. AK) at 172, 185.

[26] Anneau (Ex. H) at 44 (SM changed the scores she gave); Ball (Ex. I) at 154, 155, 178-180 (did about 4 evaluations total; Burlington provided pre-written feedback that she would cut and paste and the SM had ultimate approval); Casey (Ex. J) at 94 (his reviews often changed); Dant (Ex. M) at 19 (would draft appraisal then send for approval); Ebbs (Ex. N) at 99, 100 (she would do an initial draft but the SM made final decisions); Fortenberry (Ex. O) at 56, 57, 59 (reviews were more of a "cut and paste thing" and had to be approved by the SM); Goodman (Ex. P) at 210, 211 (district manager had final approval); Harris (Ex. Q) at 80-83 SM and HR would change reviews); Haynes (Ex. S) at 153 (SM or district HR could change reviews); Johnson (Ex. T) at 62-66 (store manger frequently made changes that she disagreed with); Kawa (Ex. U) at 63 SM had final say); Knight (Ex. V) at 166, 167 (only wrote what the SM would tell her to write); LaMaster (Ex. X) at 156, 157 (she would provide "bullet points" to the SM who actually wrote the reviews); Layne (Ex. Y) at 107, 108, 112 (reviews often changed by SM); Le (Ex. Z) at 114 SM instructed him to give certain ratings without explanation); Melendez (Ex. AA) at 193 (all performance reviews had to be approved by the SM and HR); Murillo (Ex. AB) at 120-22 (he would put his initial thoughts then store manger would make changes); Sadauskas (Ex. AC) at 116 SM had final say and changed her evaluation on "every review" she did); Sandhu (Ex. AD) at 84-86 SM usually told her the rating to give); Schmersal (Ex. AE) at 81 (he would do initial draft that would then be changed); Singson (Ex. AF) at 134 (ratings were done on a curve, so if her rating did not match the desired curve, the SM would change it); Steinfeld (Ex. AG) at 107, 108 (reviews had to be approved by HR and regional VP); Taylor (Ex. AH) at 121 SM and regional manager could make changes); Tucker (Ex. AI) at 86, 87 SM and HR had to approve reviews and it was policy that a certain number of associates had to be given a "does not meet standards" rating); Young (Ex. AJ) at 108, 110 (reviews were changed by HR); Wilson (Ex. AK) at 53 (district manager told her what to put in evaluations).

[27] Anneau (Ex. H) at 145; Ball (Ex. I) at 175; Casey (Ex. J) at 202; Currie (Ex. L) at 223; Dant (Ex. M) at 204; Fortenberry (Ex. O) at 115; Goodman (Ex. P) at 290; Harris (Ex. Q) at 150; Harrison (Ex. R) at 136; Haynes (Ex. S) at 157; Johnson (Ex. T) at 163; Kawa (Ex. U) at 154; Knight (Ex. V) at 185; LaMaster (Ex. X) at 184; Le (Ex. Z) at 169; Melendez (Ex. AA) at 303; Murillo (Ex. AB) at 167; Sadauskas (Ex. AC) at 189; Sandhu (Ex. AD) at 147; Schmersal (Ex. AE) at 145; Singson (Ex. AF) at 94; Steinfeld (Ex. AG) at 190; Taylor (Ex. AH) at 150; Young (Ex. AJ) at 136; Wilson (Ex. AK) at 175.

performed according to company policy), 293 (cannot deviate from corporate policy).

> Chambrelli-Hine also testified that ASMs cannot independently hire, fire, or discipline:

> Q The assistant store manager can never hire or fire independently of a corroborative vote from either the store manager or the regional manager, yes or no?

> A Yes.

Chambrelli-Hine (Ex. C) at 170-72; *accord* nn. 14, 16, 18, *supra*.  In fact, Ms. Chambrelli-Hine testified that ASMs could not select candidates for interview or even interview them, but could merely "prescreen a candidate":

> Q Assistant store managers could only prescreen candidates.  It couldn't even screen candidates, and as we saw before, they couldn't interview candidates, correct?

> A Correct.

> Q So assistant store managers could not screen, could not hire and fire, and couldn't even select candidates for interviews. All assistant store managers could do was prescreen a candidate, yes or no?

> A Yes.

*Id*. at 265-66.  Indeed, Burlington has conducted no study and otherwise has no basis for determining how often ASMs make recommendations related to hiring or firing, or if such recommendations (if there are any) are given any particular weight.  *Id*. at 191-92.  ASMs do not regularly schedule, review performance, train, or make recommendations about employment decisions.  *See* nn. 15, 17, 26, *supra*.  ASMs' occasional recommendations – of which there were, of course, some – are not given any particular weight inasmuch as their supervisors must approve nearly everything in accordance with company policies from which AMs cannot deviate.  Chambrelli-Hine (Ex. C) at 234-35; Young (Ex. AJ) at 120-22 (she recommended two associates for the manager in training program that were never followed); Casey (Ex. J) at 64

18

(his store manager would not take his hiring recommendations, but would rather interview the candidate himself); LaMaster (Ex. X) at 62 (suggestions were not taken); Chimezie (Ex. K) at 46 (recommended that one candidate be rejected to no avail); Sandhu (Ex. AD) at 82 (recommended that an employee be fired but he remained employed); Anneau (Ex. H) at 244, 249 (recommendations for discipline were "rarely" taken into consideration); Koleva (Ex. W) at 82, 87 (recommendations for hiring and firing were "often ignored).[28]

In effect, corporate employees (*i.e.*, Human Resources) and Store Managers are always in charge, even when they are not physically present at a store. Currie (Ex. L) at 135, 164, 205 ("stuff would have to go through HR to determine our actions"); Ebbs (Ex. N) at 113-14 (received directions from the store manager even when he was not there); Harrison (Ex. R) at 51-53 ("anything we would do, I would have to get authorization from the store manager"); Saudauskas (Ex. AC) at 99-100 (when store manager was not there, he would leave a list of tasks to be performed in his absence), 194-95 (associates reported to the store manager even when he was not there); Haynes (Ex. S) at 69 (SM was "very controlling to the point where she would call in on her days off . . . so my decisions were based on what she would prefer me to do"); Kawa (Ex. U) at 107 (SM would call 3 to 4 times per day when not there and Kawa never completed a task without direction from the SM), 124 (no decisions without the SM's approval) .[29]

---

[28] *Accord* Ball (Ex. I) at 51 SM accepted only some of her recommendations); Currie (Ex. L) at 170 (final decision was always up to the SM); Ebbs (Ex. N) at 89 (same); Harrison (Ex. R) at 119, 123 (same); Sadauskas (Ex. AC) at 119-20 (same); Tucker (Ex. AI) at 37 (rarely made hiring recommendations); Dant (Ex. M) at 40 (store manger agreed with some recommendations and disagreed with others); Le (Ex. Z) at 104 (same); Layne (Ex. Y) at 63, 64 (same); Johnson (Ex. T) at 119 SM "overruled" his recommendations for discipline).

[29] *Accord* Melendez (Ex. AA) at 193, 195, 197 (HR had to approve performance reviews, employee discipline and terminations); Steinfeld (Ex. AG) at 107, 108, 111, 112, 128, 192, 193 (HR had to approve performance reviews, hires, and changes to schedule that exceeded labor budget); Tucker (Ex. AI) at 86, 87 (same); Young (Ex. AJ) at 55 (could not initiate discipline without approval of SM and HR); Schmersal (Ex. AE) at 68 (reaches out to SM when not there

Even as to any purported management tasks ASMs rarely perform, corporate policies strictly define how they must be performed (*supra* at 5 -8), and Store Managers closely scrutinize ASMs to ensure compliance with the policies and directives.  Chambrelli-Hine (Ex. C) at 234, 293 (must performed tasks in accordance with corporate policies and  cannot deviate therefrom); Ball (Ex. I) at 126, 175 ("We all had to follow the same rules," and could not deviate from them); Harrison (Ex. R) at 47 ("we received direction on pretty much everything"); Melendez (Ex. AA) at 54 ("always new directives . . . coming from corporate.  And if the new directive showed you had to do something a certain way, then you need to go do it"); Steinfeld (Ex. AG) at 137-38 (SOPs existed for everything).

Additionally, far from "directing the work of two or more employees,"[30] the evidence is overwhelming that ASMs had very little authority or control over hourly employees' duties.  *See* nn. 13, 17, 23, 24, 26.[31]  Even to the extent they might have been able to perform such duties,

on urgent tasks);  Singson (Ex. AF) at 53 (SM leaves instructions when not there); Murillo (Ex. AB) at 93 (he had no discretion and always called the SM when he was not there); Anneau (Ex. H) at 139 (SM had to approve a change in the schedule even if he was not there); Le (Ex. Z) at 73 (same); Johnson (Ex. T) at 98 (had to get SM's approval even when out of store); Layne (Ex. Y) at 56-59 (same); LaMaster (Ex. X) at 55 (same); Fortenberry (Ex. O) at 70 (does not remember a time that SM was not at least available by phone to handle issues), 118 (has to go to the store manger even when she is the manager-on-duty).

[30] Ball (Ex. I) at 38 ("rarely" supervised associates), 66, 67 (associates "rarely" take direction from her); Chimezie (Ex. K) at 138 (needs permission from the SM to reassign an employee); Ebbs (Ex. N) at 125 (had no associates to delegate to); Harrison (Ex. R) at 141 (did not have anyone to delegate to); Johnson (Ex. T) at 70, 134, 138 (associates did not take direction from her); Kawa (Ex. U) at 144, 145 (didn't supervise associates); Koleva (Ex. W) at  69 (did not supervise); LaMaster (Ex. X) at 40 ("very rarely" supervised); Layne (Ex. Y) at 88 (did not assign tasks or manage associates); Le (Ex. Z) at 112 (gave associates very little direction); Murillo (Ex. AB) at 59 (did not give instructions to associates); Sadauskas (Ex. AC) at 173, 174 (associates were not "assigned" to her and could only have them do things with the SM's ok), 189 (did not supervise); Sandhu (Ex. AD) at 80 (did not direct other employees); Schmersal (Ex. AE) at 62 (only assigns work to associates if the SM tells him to); Tucker (Ex. AI) at 52 (often no associates to supervise); Wilson (Ex. AK) at 139 (not responsible for anyone in the store).

[31] Ball (Ex. I) at 39 (associates already knew what to do); Casey (Ex. J) at 98 (associates had "merchandising guidelines"); Chimezie (Ex. K) at 168 (there are SOPs for most hourly

ASMs were generally too busy with menial labor to do them. Ebbs (Ex. N) at. 137 ("I don't get

a chance to do my managerial job. I would love to – I would love to come in and delegate

without hav[ing] to do it myself or [to] have enough associates to get tasks done.")[32]

Burlington is well-aware that ASMs complain about the stores being short-staffed and

lacking labor budget money for hourly employees. Hubbard (Ex. D) at 197, 300 (hears this

complaint about once a month). Ms. Escoto-Reyes testified that that she receives calls from

ASMs about once per quarter complaining that "they can't get the work done because they're

short staffed," and that the ASMs had to do more hourly work as a result. Escoto-Reyes (Ex. G)

at 79-81. In fact, there is ample evidence that Burlington routinely understaffs locations

knowing that ASMs are there to fill in for hourly employees and Burlington will not have to pay

ASMs for their overtime work. *See, e.g.*, Ball (Ex. I) at 177-78 (testified that because there are

no people. . . to delegate to, you have to do it yourself. You are doing the work that an hourly

person would do."); nn. 5-10. Pervasive staffing issues were the normal business practice of

---

functions); Currie (Ex. L) at 135 (store manger makes the decision on who does what tasks); Harrison (Ex. R) at 35-40 ("We didn't have much input."); Melendez (Ex. AA) at 39 ("You were supposed to be delegating. You were supposed to be a manager. I was never given the opportunity to be a manager."); Murillo (Ex. AB) at 59 (associates already knew what to do); Sadauskas (Ex. AC) at 191 (no employees were ever "assigned" to her); Steinfeld (Ex. AG) at 137 ("The Task Manager spelled out how a task was to be done. I didn't decide how.").

[32] Chimezie (Ex. K) at 144 (no time to coach employees because of her daily hourly tasks); Goodman (Ex. P) at 226, 227 (could not manage effectively and do the tasks they expected); Koleva (Ex. W) at 69, 128 (no time to oversee employees because of her hourly work); Le (Ex. Z) at 81 (no time to act as manager on duty because of his hourly tasks); Sadauskas (Ex. AC) at 190, 191 ("I worked mainly as an hourly associate"); Sandhu (Ex. AD) at 100 (no time to give employees feedback); Schmersal (Ex. AE) at 138 (would like to coach more but was too busy with hourly tasks); Singson (Ex. AF) at 65 ("I don't have time because I want to get things done."); Steinfeld (Ex. AG) at 95 ("I personally did the tasks . . . based on the fact that there were not enough employees in that department to do it"); Young (Ex. AJ) at 39 ("We did not have an opportunity to truly manager the store or to truly engage in the training that these people were entitled to."); Wilson (Ex. AK) at 24, 25 (worked long hours doing associate's tasks).

Burlington which led to the high amounts of non-managerial work done by the ASMs.[33]  As

Plaintiff Steinfeld explained, "Most of [my] time was spent actually doing the work myself,

putting merchandise away, doing markdowns, recovering the store, reticketing, cashiering . . ."

Steinfeld (Ex. AG) at 96-97.  Plaintiff Young testified that she extended her shift "in order to get

certain tasks completed because we did not have the manpower to in which to get those items

done."  Young (Ex. AJ) at 14-15.

The overwhelming testimony from both Burlington's witnesses and the Plaintiffs

demonstrates that ASMs work under and pursuant to a comprehensive set of rules and

procedures that are identical across the country and accordingly their job duties, in actuality, are

similar (if not identical).  Steinfeld (Ex. AG) at 139 (saw other ASMs "doing the exact same

heavy lifting . . ., cashiering, putting tickets on the floor, sizing, coloring, the whole nine.

Everything I did"); Tucker (Ex. AI) at 107 ("all of the [ASMs] are basically doing the same

thing).[34]  In fact, Burlington's corporate representative testified that, as far as she knows, all

---

[33] Anneau (Ex. H) at 160 (performed hourly tasks when not enough staff); Ball (Ex. I) at 71-74 ("generally there is no one to give tasks to"); Casey (Ex. J) at 183, 184 (store was understaffed); Currie (Ex. L) at 99 (store was understaffed and had to do the tasks himself); Goodman (Ex. P) at 233, 234 (needed more hourly employees); Harris (Ex. Q) at 15 (Burlington went through a reduction in staff and full time employees); Harrison (Ex. R) at 85 (had a "very slim" staff so had to do hourly tasks herself); Kawa (Ex. U) at 64 (had no time to work with associates to create plans); LaMaster (Ex. X) at 68 (high percentage of time didn't have associates); (Ex. Z) at 165 (couldn't do managerial work because not enough associates); Melendez (Ex. AA) at 277 ("I was out there with the associates mainly because I didn't have enough associates."); Murillo (Ex. AB) at 80 (had to do tasks himself because not enough employees); Sadauskas (Ex. AC) at 191 (was directed to do hourly tasks by the SM on a daily basis); Sandhu (Ex. AD) at 136 (not enough people so she had to do non-exempt work); Steinfeld (Ex. AG) at 188, 189 ("Most of the time . . . there was not enough help . . . so I wound up doing most of the work myself"); Tucker (Ex. AI) at 52 (often no associates to delegate to); Young (Ex. AJ) at 14, 15 (did not have payroll or manpower to get tasks done).

[34] Anneau (Ex. H) at 228 (observed other ASMs perform customer service); Ball (Ex. I) at 91 (other ASMs in her store do hourly work); Currie (Ex. L) at 213 (other ASMs did hourly work); Goodman (Ex. P) at 101 (ASMs all do the same thing); Harris (Ex. Q) at 141 (same); LaMaster (Ex. X) at 173-75 (observed other ASMs doing the same things she did); Melendez (Ex. AA)

Burlington ASMs do essentially the same things:

> Q As far as you know, assistant store managers, although they don't do the exact same thing from store to store, they do substantially the same thing.  Can we agree to that?

> A. Yes.

Chambrelli-Hine (Ex. C) at 224-25.

Although the merits of the FLSA claims are not at issue in the present motion, the foregoing depth and breadth of evidence comprehensively supports Plaintiffs' claim that ASMs' job duties do not fall under either the executive or administrative exemptions and that they are, in terms of their job duties and what they do, "similarly situated."  *See* cases cited *infra* at 26-32.

### C.    Burlington's "State of Mind" Defenses Are Common

Plaintiffs' duties and responsibilities are not the only matters that can appropriately be tried in a collective action trial; so, too, can Burlington's defenses, which are identical for all Plaintiffs.  In any FLSA case, there are two, related issues going to the state of mind defenses of a defendant: whether the defendant willfully (which in this context means recklessly) violated the FLSA, and whether the defendant had good cause for what it did.  The first question determines the statute of limitations, while the second permits liquidated damages.  29 U.S.C. § 216(b); 29 U.S.C. § 255(a); *McLean v. Garage Mgmt. Co. LLC,* 2012 U.S. Dist. LEXIS 55425, at *12-20 (E.D.N.Y. Apr. 19, 2012) (describing FLSA's good faith and willfulness defenses). "To establish the requisite subjective good faith, an employer must show that it took <u>active steps</u> to ascertain the dictates of the FLSA and then act to comply with them."  *Id*. at *13 (emphasis added).  To prove a willful violation of the FLSA, Plaintiffs must establish "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by

---

143, 144 (observed other ASMs allocating their time the same as he did); Taylor (Ex. AH) at 143 (all the ASMs doing the same things he was because they were all under the same "taskmaster").

statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).

Here, Burlington's decision to classify all ASMs as exempt is not based on any individual analysis of ASMs' actual job duties. Chambrelli-Hine (Ex. C) at 56-57 (testifying that neither she nor anyone at Burlington had ever undertaken a study to determine how ASMs actually spend their time). Consistent with this testimony, even though Ms. Chambrelli-Hine acknowledged that there are a variety of ways to accurately track what an ASM's primary responsibility is, Burlington never did so. *Id*. at 102-103, 182-83. Importantly, Ms. Chambrelli-Hine was designated by Burlington as a person most knowledgeable to speak on its behalf I this case, as well as four other wage and hour cases. *Id*. at 193. In that capacity, she believes that she has superior knowledge over any other Burlington Executive on wage and hour issues. *Id*. at 194. Notwithstanding that, Burlington never evaluated the job duties of an individual ASM to make sure the classification was correct, never undertook any study to determine how much time ASMs spend performing non-exempt work versus exempt work, and never documented the actual job duties performed by an ASM in any given time period. *Id*. at 182-83. Burlington also never conducted a time study with respect to ASMs' job duties, engaged the Department of Labor to conduct an FLSA audit to ensure that its ASMs are properly classified, and never asked outside counsel to conduct such an audit. *Id. at 66-70.*[35]

Despite Burlington's failure to conduct any interviews, studies, or analyses regarding whether the ASMs' classification is proper, and despite Ms. Chambrelli-Hine's admissions in her deposition (Ex. C) that ASMs clean the store (p. 124), engage in customer service (p. 122-23), unload trucks (p. 122), stock merchandise (p. 121), cannot unilaterally hire or fire employees (p.

---

[35] A failure to do any such inquiry or study are indicative of a reckless disregard for the FLSA's requirements. *See, e.g., Stillman, supra; Brock v. Wilamowsky,* 833 F. 2d 11, 19 (2d Cir. 1987); *Martin v. Cooper Elec. Supply Co.,* 940 F.2d 896, 908 (3d Cir. 1991).

170-72, 265-66), cannot choose the merchandise to sell or set the prices (p. 177), and cannot deviate form corporate policies (p. 293-94), and in spite of the findings in the Axsium Study (p. 12-14 *supra*), Burlington still maintains its blanket exemption of all ASMs.[36]

## II.    THE CLAIMS HERE SHOULD BE FINALLY CERTIFIED FOR TRIAL

### A.    The FLSA Is a Remedial Statute to be Given Broad Application for Collective Actions to Vindicate Employees' Statutory Rights

The Supreme Court has authorized courts to join multiple parties through FLSA collective certification.  *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165 (1989).  Collective actions are favored because they allow for the "efficient resolution in one proceeding of common issues of law and fact," in addition to "lower[ing] individual costs to vindicate rights by the pooling of resources."  *Id.* at 70; *see also Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Pa. 2000) (certifying collective actions achieves the FLSA's objectives of lowering costs and efficiently resolving common issues of law and fact in one proceeding).  Because the term "similarly situated" is not defined by the FLSA, and in "the absence of guidance from the Supreme Court and the Third Circuit, district courts have developed a test consisting of two stages of analysis to determine if employees are similarly situated."  *See, e.g.*, *Zanes v. Flagship Resort Dev., LLC*, 2012 U.S. Dist. LEXIS 22191, at *6 (D.N.J. Feb. 22, 2012) (citations and internal quotations omitted); *accord Ruffin v. Avis Budget Car Rental, LLC*, 2014 U.S. Dist. LEXIS 9562, at *4 (Jan. 27, 2014).  In stage one certification, a plaintiff moves for conditional certification of the class and stage two is the final determination on class certification if the defendant moves to decertify.  *Id*. at *7. "If the court determines during the stage two determination that the class of plaintiffs are 'similarly situated,' then the case may proceed to

---

[36] Tellingly, Burlington's resident in-house wage and hour expert, put forth as its corporate designee on five occasions, did note even know what the "FLSA" stood for.  Id. at 23-24.

trial as a collective action."  *Id.* at *8; *see also Garcia v. Freedom Mortgage Corp*, 790 F. Supp.

2d 283 (D.N.J 2011).  In *Zavala v. Wal-Mart Stores, Inc.*, 691 F.3d 527, 537 (3d Cir. 2012), the

Court Appeals clarified that Plaintiffs bear the burden of proof for second stage certification by a

preponderance of the evidence showing as to "'whether the plaintiffs *who have opted in are in*

*fact* 'similarly situated' to the named plaintiffs.'"  *Zavala v. Wal-Mart Stores, Inc.*, 691 F.3d 527,

536 n.4 (3d Cir. 2012) (quoting *Myers*, 624 F.3d at 555 n.10 (emphasis supplied); *accord*

*Goodman v. Burlington Coat Factory*, 2012 U.S. Dist. LEXIS 166910, at *26-27 (D.N.J. Nov.

20, 2012) (noting that the pertinent inquiry is about the "ASMs who actually opt in") (citing *id.*).

**B.**    **Plaintiffs' Employment Settings Need Not Be Carbon Copies to Be "Similarly Situated"**

"As courts have routinely held, Plaintiffs do not need to be identical to be similarly

situated for purposes of a FLSA collective action."  *Ruffin*, 2014 U.S. Dist. LEXIS 9562, at *6

(citing, inter alia, *Stillman,* 2009 U.S. Dist. LEXIS 42247, at *68 (quoted at page 4, above));

*accord Chabrier v. Wilmington Fin., Inc.,* 2008 U.S. Dist. LEXIS 27761 (E.D. Pa. Apr. 4, 2008);

*Gayle v. Harry's Nurses Registry*, *Inc*., 2012 U.S. Dist. LEXIS 28157, at *14 (E.D.N.Y. Mar. 1,

2012) ("[E]ven at this stage, Plaintiffs may support their claims through generalized proof and

need show only that their positions are similar, not identical.").  A conditional certification

should be converted into a final collective action certification where "the plaintiffs make some

showing that the nature of the work performed by other claimants is at least similar to their

own." *Morisky v. Public Serv. Elec. & Gas Co.,* 111 F. Supp. 2d 493, 498 (D.N.J. 2000). And, as

Judge Wiggenton approvingly wrote earlier this year in denying decertification in another retail

assistant manager misclassification case (a case that this Court cited in its conditional

certification decision), plaintiffs can be similarly situated "despite minor disparities" if

"'plaintiffs generally 'perform a similar swath of duties, ranging from customer service to office

work.'" *Ruffin*, 2014 U.S. Dist. LEXIS 9562, at *6 (citing *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 421, on reconsideration in part, 293 F.R.D. 578 (S.D.N.Y. 2013)).

In *Zavala*, the Third Circuit wrote that the second stage factors "include, but are not limited to: whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment." *Id*. at 536-37. These are all readily met here: Plaintiffs are employed in the same position (albeit in different locations, which is not a material difference in a misclassification case[37]), under the same compensation criteria and are advancing the same claims seeking the same relief.

Courts, including specifically this Court, most regularly use three factors to reach a final determination on class certification under the FLSA: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to [defendants] which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations." *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 359 (D.N.J. 1987), *vacated in part sub nom. Lusardi v. Lechner*, 855 F.2d 1062 (3d Cir. 1988); *accord, e.g., Ruffin*, 2014 U.S. Dist. LEXIS 9562 at *5. "This list is neither exhaustive nor mandatory to grant certification." *Bredbenner v. Liberty Travel, Inc.,* 2011 U.S. Dist. LEXIS 38663, at *49 (D.N.J. Apr. 8, 2011) (citation omitted); *see also Aquilino*, 2011 U.S. Dist. LEXIS 15759, at *5.

### 1.    ASMs' Factual and Employment Settings Are Substantially Similar

This Court previously recognized that there were core similarities in Plaintiffs' claims:

Mr. Goodman's evidence includes:  the ASM job descriptions, which apply to all

---

[37] *See Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 52 (3d Cir. 1989) (upholding certification under 29 U.S.C. § 216(b) where opt-in plaintiffs were subject to the same pattern, plan or practice of willful age discrimination by their employer, even though the opt-in plaintiffs worked in different branch locations).

ASMs nationwide; several Burlington corporate policies and procedures, which
include a uniform method of compensation and apply to all ASMs nationwide;
Burlington's Rule 30(b)(6) deponent's testimony confirming the uniformity of
Burlington's corporate structure; a former District Manager's testimony, and Mr.
Goodman and two opt-ins' deposition testimony, which indicate that the Plaintiffs
spent a majority of their time performing non-exempt tasks, worked more than
forty hours in a workweek, and that Plaintiffs did not receive overtime
compensation.

.....

the Court notes that all Burlington ASMs nationwide are subject to the same
uniform job descriptions, training procedures, work regulations, and
compensation policies, including a uniform classification of all ASMs nationwide
as "exempt" under the FLSA. Mr. Goodman's testimony and the testimony of the
ASM opt-ins indicate that they performed the work of non-exempt hourly
employees and worked over forty hours in a workweek without receiving
overtime compensation.

*Goodman*, 2012 U.S. Dist. LEXIS 166910 at *23-24. The Court further "note[d] that all

Burlington ASMs nationwide are subject to the same uniform job descriptions, training

procedures, work regulations, and compensation policies, including a uniform classification of

all ASMs nationwide as 'exempt' under the FLSA" and that "Mr. Goodman's testimony and the

testimony of the ASM opt-ins indicate that they performed the work of non-exempt hourly

employees and worked over forty hours in a workweek without receiving overtime

compensation." *Id.* at *25. As shown, this has been corroborated by the substantial discovery

since then. Plaintiffs hold the same job title, have the same job description, are subject to the

same comprehensive corporate policies, work rules, and corporately derived training program,

primarily performed the same non-managerial job duties, had the same levels of authority, but

were not paid overtime due to Burlington's common policy. The primary difference between the

conditional certification motion and now is that now there is just far more testimony concerning

"the similar swath of duties" done by the ASMs who have joined the case. *Ruffin*, 2014 U.S.

Dist. LEXIS 9562, at *6.

In such a circumstance, proceeding as a collective action is appropriate. Indeed, in

January, Judge Wigenton denied a defendant's motion for decertification where, as here, an employer allegedly misclassified assistant managers, and found that plaintiffs were similarly situated because the "deposition testimony of Plaintiffs and Defendants' witnesses demonstrates that Plaintiffs performed primarily the same job duties, were nearly all given the job title and job description of Shift Manager, and underwent the same training program, and were subject to the same policies – including not being paid overtime wages." *Ruffin*, 2014 U.S. Dist. LEXIS 9562, at *8-9. The same is no less true here. As did those in *Ruffin*, Plaintiffs here hold the same job title, have the same job description, are subject to the same comprehensive corporate policies and work rules, undergo the same corporately derived training program, primarily perform the same non-managerial job duties, have the same levels of authority, and work more than 40 hours per week but are not paid overtime due to Burlington's common corporate policy. *Supra* at 5-9. In specific after specific area, their testimony demonstrates the core substantial similarities. *Supra* at 9-23. *Ruffin* is not alone; indeed, this is the very kind of misclassification collective action where decertification has been denied. *See also, e.g., Morrison v. Ocean State Jobbers, Inc.,* 2013 U.S. Dist. LEXIS 40010 (D. Conn. Mar. 22, 2013); *Scott v. Aetna Servs.,* 210 F.R.D. 261 (D. Conn. 2002); *Perkins v. S. New Eng. Tel. Co.,* 669 F. Supp. 2d 212 (D. Conn. 2009). Such cases have gone to trial and been upheld against post-trial challenge, including in one leading such case that was tried in this Court. *See Stillman, see also, e.g., Morgan, supra.* In fact, there have been other analogous retail chain store misclassification cases that have been certified under the more stringent Rule 23 standards. *See Damassia, Youngblood*, *supra; Jacob v. Duane Reade, Inc.,* 289 F.R.D. 408 (S.D.N.Y. 2013).

Burlington predictably will try to point to individual differences, but as Judge Wigenton wrote in *Ruffin* in words that would no less fairly characterize the testimony in this case:

29

> Although Defendants emphasize differences in testimony with respect to managerial duties, the record shows that Plaintiffs "do not regularly interview, schedule, review performance, train, or make recommendations about employment decisions." While there are disparities in the deposition testimony about job duties, they are not material, and "any such differences are outweighed by the similarities between [the] Plaintiffs." Moreover, to the extent that Plaintiffs were engaging in any managerial tasks, it was limited. At bottom, the record reflects that there were not significant differences with respect to Plaintiffs' factual and employment settings.
>
> ...
>
> While the record contains variations with respect to certain aspects of Plaintiffs' job duties, they are immaterial differences.

2014 U.S. Dist. LEXIS 9562, at *9 (internal citations omitted). No less applicable given the

record here are the words of Judge Oetken last year when he certified another Rule 23 class of

assistant store managers:

> While the [employee's] experience certainly varies at the margins, it appears from the deposition testimony, together with the non-cross-examined declarations offered by [Duane Reade]—that most, if not all, [employees] perform a similar swath of duties, ranging from customer service to office work. It is true that some [employees] perform tasks that others may never do. . . . However, these minor deviations do not eliminate the overriding consistencies present throughout all the testimony—consistencies that bolster the Court's determination that [the employees] have similar primary responsibilities . . .

*Jacob*, 289 F.R.D. at 420-21. This decision joins a litany of other such rulings:

> [Defendant] argues that the named plaintiffs' claims are not typical because of "stark differences in the duties they and other potential class members performed, . . . the extent that they performed managerial and non-managerial tasks, and the amount of discretion and judgment they exercised." However, the "stark differences" raised by SNET are not so stark. Although each named plaintiff may have performed some exempt duties, the evidence before the court demonstrates that the majority of both the named plaintiffs' and other opt-in plaintiffs' time is spent on non-discretionary, clerical work, and that they have little to no authority to make decisions on their own.

*Perkins,* 669 F. Supp. 2d at 223-25 (internal citations omitted). When faced with the same

contentions as those here, Judge Berman certified a Rule 23 manager class with words apt here:

> While Defendants point to some differences in the job duties of some Family Dollar store managers, most of these differences are immaterial to the exemption

issues raised in this case (e.g., whether "[e]very manager has a different style"; whether one store manager "had more problems with employees" at one store than at another; how frequently each store manager was in contact with his or her district manager; and whether all store managers read the corporate policies or relied upon what the "district manager told [them] they were"). "[T]here is no evidence that [any such differences] are of such a magnitude as to cause individual issues to predominate," *Damassia*, 250 F.R.D. at 160, particularly in view of the comprehensive written Family Dollar policy manuals and the testimony of Family Dollar's designated corporate executive that all store managers "are responsible for getting recovery done" and for "managing . . . the assets that are in the store," and that their "primary dut[y]" is "[t]o run a profitable store".

*Youngblood*, 2011 U.S. Dist. LEXIS 115389 at *18. As class counsel there (and in *Ruffin*), the undersigned can state that the record here is as strong as, if not stronger, than what existed before Judge Berman, which involved store managers (not a second level of "manager" as exists here).

In addition to these points, it is also relevant that Burlington made (as discussed *supra* at 24-25) a blanket determination that its nationwide classification of all ASMs as exempt complied with the FLSA without considering any individualized circumstances. While a blanket determination alone would not support a collective action final certification, Burlington may argue that a blanket determination at trial cannot – and should not – be made. It should not be allowed to speak out of both sides of its mouth. *See Nerland v. Caribou Coffee Co.,* 564 F. Supp. 2d 1010, 1024 (D. Minn. 2007) ("it [is] disingenuous for [the defendant], on one hand, to collectively and generally decide that all store managers are exempt from overtime compensation without any individualized inquiry, while on the other hand, [claim] the plaintiffs cannot proceed collectively to challenge the exemption"); *Myers v Hertz*, 624 F.3d 537, 549 (2d Cir. 2010) ("such a [blanket] policy suggests the employer believes some degree of homogeneity exists among the employees"); *Youngblood*, 2011 U.S. Dist. LEXIS 115389, at *19 ("That [the defendant] makes such a blanket determination is evidence that differences in the store manager position, to the extent that there are any, are not material to the determination of whether the job

is exempt from overtime requirements.").

### 2. Whether the Case Is Analyzed Under the Executive or Administrative Exemption, the Same Defenses Apply for All Plaintiffs

The second relevant criteria are the defenses which Burlington could assert. This factor is easily met because similar to its blanket classification of ASMs, Burlington has pursued a unified defense strategy throughout this case that all ASMs are exempt from overtime because their primary duty was management and they are exempt under the executive and administrative exemptions. *See* Burlington's Answer to Amended Complaint, ECF Doc. no. 7. Regardless of the exemption, "because the FLSA is a remedial statute, the Supreme Court has long held that exemptions from the FLSA are to be narrowly construed against the employer." *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 694 (3d Cir. 1994). Under either exemption – the executive or the administrative – the determination of the exemption is central to the claims of all plaintiffs, and "determining whether Plaintiffs fall under an exemption would not make the class unmanageable." *Ruffin*, 2014 U.S. Dist. LEXIS 9562, at *9. In addition to the numerous citations above, courts reject an individualized inquiry argument based upon exemption status:

> [Defendant] contends the Court must individually evaluate whether a particular exemption applies to an employee . . . [requiring] an analysis of each individual [opt-ins'] daily job duties. However, if such an argument were credited, 'no FLSA action could be resolved through the collective action process, thereby defeating the stated purpose of the FLSA and wasting judicial resources by requiring courts to consider each individual plaintiff's claims in a separate lawsuit.

*Ahle v. Veracity Research Co.*, 738 F. Supp. 2d 896, 923 (D. Minn. 2010) (quoting *Indergit v. 27 Rite Aid Corp.*, 2010 U.S. Dist. LEXIS 60202, at *32-33 (S.D.N.Y. June 15, 2010)); *accord Morgan*, 551 F.3d at 1263. "Once the pattern is established, the burden shifts to the employer to rebut the existence of the violations or to prove that individual employees are excepted from the pattern or practice." *Reich v. Gateway Press*, 13 F.3d 685, 702 (3d Cir. 1994) (citations omitted).

### 3.    *Fairness and Procedure Favor Plaintiffs*

With 29 U.S.C. § 216(b), Congress affirmed that plaintiffs asserting FLSA claims "should have the opportunity to proceed collectively" and that collective actions have "the advantage of lower individual costs to vindicate rights by the pooling of resources." *Hoffman La-Roche*, 493 U.S. at 170. "The judicial system [also] benefits by efficient resolution in one proceeding of common issues of law and fact." *Id*. While Burlington will probably assert that litigating this misclassification case as a collective is somehow unfair, "[t]here is nothing unfair about litigating a single corporate decision in a single collective action, especially where there is robust evidence that [employees] perform uniform, cookie-cutter tasks mandated by a one-size-fits-all corporate manual." *Morgan*, 551 F.3d at 1264 (SM misclassification case).

This collective action has approximately 569 members. Upon decertification, one of two things would happen. The first is that scores of the ASMs would re-file lawsuits addressing the same misclassification claim. If that occurs, the Court could face (say) 200 individual trials or summary judgment motions where the same evidence of Burlington's policies would be addressed over and over and over again. The same comprehensive corporate policies will be introduced; the same nature of the job will be presented with the same job descriptions, training and directives, and the same issues of whether as to Burlington acted "willfully" and in "good faith" will be adjudicated and will be adjudicated with the exact same evidence (since the exemption determination was corporate-wide). Having multiple lawsuits would "contravene[] the policy behind collective actions under section 216(b) of the FLSA of allowing plaintiffs to vindicate their rights with lower individual costs by pooling resources" and "would waste more judicial time and resources than trying plaintiffs' cases individually would preserve." *Nerland*, 564 F. Supp. 2d at 1025-26; *accord, Andrako v. United States Steel Corp.*, 788 F. Supp. 2d 372,

33

383 (W.D. Pa. 2011) ("Decertifying this case would potentially result in more than 250 individual trials, which not only is the worst possible outcome in terms of efficiency, but also would place each opt-in Plaintiff back at square one without the benefit of pooled resources to resolve the common liability questions in this case").

The second scenario is that ASMs will not pursue their individual claims because of the relatively small amount in controversy and the lack resources to combat their well-funded employer. *Bradford*, 184 F. Supp. 2d at 1351 ("[a]s a practical matter, plaintiffs can hardly be expected to pursue these small claims individually, so there is little likelihood that their rights will be vindicated in the absence of a collective action"); *Pendlebury*, 518 F. Supp. 2d at 1363 ("Defendant's suggestion that few Plaintiffs would re-file is the precise reason Congress authorized class action treatment for these types of cases").

As Judge Wigenton found in *Ruffin*, "procedural considerations and fairness weigh in favor of collective treatment of Plaintiffs. Because the record testimony indicates similarities among Plaintiffs' duties, responsibilities, training, and tasks, a collective action would effectively lower the parties' costs, limit the controversy to one proceeding, and promote judicial efficiency." 2014 U.S. Dist. LEXIS 9562, at *9. The same is no less true here.

Thus, "[g]iven the substantial similarity of the class members' jobs and uniform corporate treatment of the store managers, it would not serve the interest of judicial economy to require these overtime-pay claims to be adjudicated in [] individual trials." *Morgan,* 551 F.3d at 1265; *accord, e.g., Bradford, Garcia, Morrison, Nerland, Perkins, Stillman, supra.*

### C.    There Is No Issue In This Case As To Hours Worked

Almost reflexively, in nearly every FLSA case defendant employers try to argue that damage determinations through a representative trial process are not permitted. *See, e.g.*, *Ruffin*

34

*v. Avis Budget Car Rental, LLC*, 2014 U.S. Dist. LEXIS 128596 (D.N.J. Sept. 15, 2014) (denying interlocutory appeal of issue).  In doing so, they forget that over six decades ago the Supreme Court established the propriety of using representative testimony to prove both liability and damages in a collective action, which the Third Circuit has followed.  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) (liability and damages established based on testimony of 8 out of 300 class members); *Reich*, 13 F.3d at 701 (holding that "[c]ourts commonly allow representative employees to prove violations with respect to all employees" in allowing the testimony of 22 out of 70 employees); *Martin v. Selker Bros.*, Inc., 949 F.2d 1286, 1298 (3d Cir. 1991) ("It is not necessary for every single affected employee to testify in order to prove violations or to recoup back wages. The testimony and evidence of representative employees may establish prima facie proof of a pattern and practice of FLSA violations.").  Here, almost uniquely among the misclassification cases of which counsel is aware, this issue is not even present because, in this case, Burlington kept time records for its ASMs and the parties have stipulated to the correctness of such records in this case. ECF Doc. no. 208 at p. 2.  This, too, argues in favor of a representative action.

## CONCLUSION

For all the foregoing reasons, Plaintiffs' Motion for Final Certification should be granted.

Dated:  November 18, 2014                          Respectfully submitted,
      Rye Brook, New York

                                  By:_s/Seth R. Lesser_____
                                  Seth R. Lesser
                                  KLAFTER OLSEN & LESSER LLP
                                  Two International Drive, Suite 350
                                  Rye Brook, New York 10573
                                  Tel:    (914) 934-9200
                                  Fax:    (914) 934-9220