# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

STEVEN GOODMAN, et. al. :
                         :
        Plaintiffs,    :      **Hon. Joseph H. Rodriguez**
                          :
      v.               :      Civil Action No. 11-4395 (JHR)
                          :
BURLINGTON COAT FACTORY, et. al., :
                          :      **OPINION**
        Defendants.    :
                          :

These matters come before the Court on several motions of the parties: Plaintiffs' Motion [338] to Preclude the Testimony of Robert Crandall, Pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc. 509 U.S. 579 (1993); Defendants' Motion [341] to Decertify the Class; Plaintiffs' Motion [348] to Certify Class – Final Certification of Fair Labor Standards Act Collective Action; and Plaintiff's Motion [350] To Seal Exhibits Al-Ay of Plaintiffs' Motion For Final Certification of Fair Labor Standards Collective Action. This Opinion addresses Plaintiffs' Motion [338] To Preclude Testimony of Robert Crandall and Motion [350] To Seal.[1]

Over the course of four non-consecutive days, the Court conducted a Daubert hearing on the admissibility and reliability of the testimony of Defendants' expert, Robert Crandall.[2] In addition, the Court heard argument on the competing motions to

---

[1] The Court will issue a separate Opinion and Order on the motions related to final certification [Dkt. Nos. 341, 348] in the coming weeks.

[2] Robert Crandall is a Partner at Resolution Economics, an organization that focuses on accounting and labor economics, workforce studying in both a non-litigation and litigation posture. Hearing Transcript, Dec. 9, 2015, 72:10-19- 73:20-74:18. Crandall testified that the vast majority of his work involves "examining wage-and-hour issues." Id. at Dec. 8, 2015, 7:8-10. Crandall most often performs his services for the benefit of the defendant in FLSA litigation. Id. Plaintiffs do not challenge Crandall's qualifications as an expert in his field of economics and labor studies, per se. Plaintiffs contend that Crandall is precluded from opining on questions of law and general cultural behavior as predictive of intent in the employment setting. The attacks on Crandall do not necessitate a finding on his qualifications. Rather, as

certify and decertify. The Court has considered the initial written submissions of the parties, the testimony and arguments presented at the hearings on December 8-9, 2015 and March 16-17, 2016, and the supplemental briefing submitted by the parties. The Motion to Preclude is denied in part and granted in part and the Motion to Seal is granted.[3]

## I.     **Factual and Procedural History**

The Court reincorporates the relevant factual background set forth in Goodman v. Burlington Coat Factory, No. 11-CV-4395 (D.N.J. Nov. 20, 2012). Burlington is a nationwide retail department store chain that sells merchandise through 465 brick-and-mortar stores in 44 States across the United States. Ansara Dep. Tr. 13. The named Plaintiff, Steven Goodman, worked as an operations manager at Burlington from approximately August 2005 until August 2009. Goodman Dep. Tr. 911; 182:9. Mr. Goodman alleges that Burlington misclassified him and other assistant store managers (ASMs)[4] as exempt under the FLSA and failed to pay them for all hours worked as well as overtime for hours worked above 40 in a workweek, in violation of the FLSA. Am. Compl. ¶ 1.

---

will be discussed infra., the methodology employed to support his conclusion is the basis of Plaintiffs' Motion to Preclude.

[3] After consideration of the Declaration of Counsel Seth Lesser, [Dkt. No. 350] and no opposition having been filed, the Motion to Seal Exhibits AL-AY of Plaintiff's Motion for Final Certification of Fair Labor Standards Collective Action is granted.

[4] The collective action encompasses all "assistant store managers," which includes the two current positions known as "customer services logistics manager" and "merchandise manager." A fully-staffed management team at a Burlington store consists of one store manager, one customer service logistics manager, and two merchandise managers. Ansara Dep. Tr. 74. Burlington created the "customer services logistics manager" position in May 2011, which combined two separate positions formerly called "operations manager" and "customer services manager." According to the Plaintiffs' Amended Complaint, there are at least 250 potential members of the collective action class. Am. Compl. ¶ 17.

Plaintiffs allege that Burlington's classification of the ASM position as "exempt" under the FLSA was wrongful, as ASMs perform non-managerial work "that requires little skill and no capital investment and their duties and responsibilities do not principally include any managerial responsibilities or the exercise of independent judgment" and ASMs "do not have the authority to hire or fire other employees, and they are not responsible for making hiring and firing recommendations." Id. at ¶ 29. Additionally, Plaintiffs claim that they spent the majority of their time performing work typically assigned to employees, such as working on the sales floor, opening boxes, ticketing merchandise, stocking shelves, cashiering, unloading trucks, and cleaning the bathrooms.[5] Plaintiffs complain that they were required to work more than 40 hours in a workweek and did not receive overtime compensation.[6]

---

[5] Named Plaintiff Steven Goodman testified that he worked within the "guidelines" set by Burlington and could not independently make hiring decisions for the store, create a budget, order from outside vendors, make store repairs, approve overtime, fire employees, or select days for truck deliveries. Goodman Dep. Tr. 115:14-14, 133:5-135:4; 213-215; 292:19-293:14; 291:1-5. Mr. Goodman testified that "corporate" selects the products for the store, sets prices, and selects product locations. Id. at 290:6-291:7. Opt-in Plaintiff Donna Wilson testified that she was not responsible for developing strategies to increase revenue and cut costs, approving overtime, hiring or terminating employees, setting pay rates, setting the store hours of operation, determining product placement, determining product pricing and markdowns, hiring outside vendors, or setting the store temperature, as "corporate," the "store manager" or the "district manager" had authority over these tasks. Wilson Dep. Tr. 172:6 - 176:23. Opt-in Plaintiff Edwin Murillo testified that while he worked as an ASM, Burlington "corporate" selected the products to be sold in the store, set the prices and markdowns of the products, decided where to display the products, developed strategies to cut costs and increase revenue, set the labor budget, decided the music to be played in the store, decided the temperature of the store, and that a "store manager" or "district manager" authorized associate overtime, hired and fired employees, set sales associates' pay rates, and store hours of operation. Murillo Dep. Tr. 166:23-174:4. Additionally, opt-in Plaintiff Wanda West's declaration indicates that ASMs where she worked "had very little decision-making responsibility" and neither she nor opt-in Plaintiff Sharron Layne were responsible for decisions such as hiring or firing, setting store hours, setting product prices, setting the dress code, and could not independently discipline an employee. West Dec. ¶¶15-22; Layne Dec. ¶¶ 16-19.

[6] Goodman testified that "the company wanted 80 to 90 percent of the time to be doing floor work, not supervising." Goodman Dep. Tr. 151:19-21. He also testified that "[w]e were told by corporate that if we were in the office more than 10 to 20 percent of the time, that we weren't doing our job." Id. at 99:15-17. Goodman testified that he spent 80 to 90 percent of his day

Through the testimony of its Rule 30(b)(6) corporate representative, Burlington indicates that all ASMs are subject to the same policies and procedures. Burlington creates an employee handbook, system of core values, code of business conduct and ethics, and workplace rules and policies that apply to all Burlington employees regardless of the store's size, location, or geographic region in which they work. Pls. Mot. Exs. A, L-R; Ansara Dep. Tr. 36-37, 42-47, 50-55. The same job descriptions apply to all ASM positions across the United States, regardless of the store's location, size, or hours of operation and only one job description is in effect at any given time. Ansara Dep. Tr. 82-83, 89, 91 93. ASMs are subject to the same training requirements, as Burlington requires all new ASMs to attend a classroom-style training program, which is uniform throughout the country and taught by a Burlington Regional Human Resource Director. Ansara Dep. Tr. 29-30. Burlington also requires ASMs to complete computer-based e-learning modules and remain up to date through Burlington's internal intranet

---

performing "hourly tasks" such as "receiving, opening up boxes, putting them on the floor, making sure they're priced, cleaning up the back, bringing the truck in, cashiering, sweeping, cleaning the bathrooms, cleaning the break room, [and] putting merchandise on the floor." Id. at 234: 5-9, 15). Wilson testified that she spent 90 percent of her time performing tasks such as unpacking boxes, filling the racks on the sales floor, operating the register. Wilson Dep. Tr. 69:16-22. Wilson testified that when she worked as a merchandising manager, "[m]y job description was to assist the store manager, hiring, recruiting the employee, training, coaching, analyzing the business. Id. Goodman testified that he worked over 55 hours per week throughout his employment as an ASM and worked on average between 65 and 75 hours per week. Goodman Dep. Tr. 14:1-4; 296:13. Wilson testified that she worked an average of 59-69 hours per week. Wilson Dep. Tr. 177:1-178:14 Opt-in Plaintiff Edwin Murillo testified that he worked "between 50, 58 hours, maybe more" per week. Murillo Dep. Tr. 173:4. Additionally, the two opt-in Plaintiffs' declarations indicate that they worked over 40 hours per week and did not receive overtime compensation. (Layne Dec. ¶¶ 7, 8 (worked "on average, between 50-55 hours per week" and "was paid a set salary each week and did not receive overtime when I worked more than 40 hours in any workweek"); West Dec. ¶¶ 7, 8 ("I typically worked between 48-50 hours per week" and "I was paid a salary and was not paid any overtime if I worked more than 40 hours in a workweek.")).

messaging system "portal.coat.net," the content of which is the same for all ASMs across the country. (Ansara Dep. Tr. 69-71; Pls. Mot. Ex. J (E-learning modules)).

Further, Burlington compensates all ASMs in the same manner and classifies all ASMs as exempt.[7] Burlington's Salary Guidelines Brochure and Mr. Ansara's testimony both indicate that all ASMs are paid a fixed annual salary and they do not receive overtime compensation. Pls. Mot. Ex. K (Burlington Salary Guidelines Brochure) at BCF 109-110; Ansara Dep. Tr. 99. Burlington classifies all ASMs as exempt from the overtime requirements of the FLSA, regardless of the individual ASM's tenure, the ASM's supervisor or manager, or the store's location, size, sales volume, hours of operation. Ansara Dep. Tr. 99-102.

Burlington also commissioned an expert to evaluate the nature of the work that ASMs perform on a daily basis in order to prove that the ASMs are not misclassified as exempt under the FLSA and/or not similarly situated in a manner that compels class certification. Burlington's expert, Robert Crandall, is a frequent FLSA litigation expert who, *inter alia*, re-examines a company's qualitative data, including scheduling, timekeeping, customer flow, and payroll, and juxtaposes that data with employee job descriptions, performance evaluations and current employee declarations to formulate the likelihood of whether the company has misclassified certain employee positions. Crandall Curriculum Vitae, Crandall Report, Attachment A.

---

[7] The FLSA regulates payment calculation for classes of employees. Pursuant to 29 U.S.C. § 207(a)(1), employers are required to pay an employee who works in excess of 40 hours per week at a rate of one and a half times their regular rate of pay for all hours. 29 U.S.C. § 207(a)(1). Certain classes of employees are classified as being "exempt" from overtime pay, such as those "employed in a bona fide executive, administrative, or professional capacity." Id. § 213(a)(1). The burden of proving that an employee is properly classified as exempt falls on the employer. Johnson v. Big Lots Stores, Inc., 561 F. Supp. 2d 567, 572 (E.D. La. 2008) (citing Corning Glass Works v. Brennan, 417 U.S. 188, 196-97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 206, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966); Dalheim v. KDFW-TV, 918 F.2d 1220, 1224 (5th Cir. 1990); Kastor v. Sam's Wholesale Club, 131 F.Supp.2d 862, 865 (N.D. Tex. 2001)).

Here, as will be discussed further in detail, Crandall created and implemented a time and motion study to evaluate the daily tasks performed by randomly selected ASMs in various Burlington stores. The study observed sixty (60) ASMs who are not part of the opt-in Plaintiff group and did not include any discussions with or declarations from these workers. Crandall's findings are laid out in a statistical analysis report, replete with attachments and exhibits which graphically depict his findings. The report is offered by Burlington as proof that the tasks performed by ASMs are not only primarily managerial but also demonstrate that the variance in the manner each ASM performs work significantly undercuts Plaintiffs' argument that they are similarly situated for class certification purposes.[8]

The voluminous record evidence in this case includes expert testimony in support of the parties' competing certification motions. Both expert opinions bear directly on the Court's final certification considerations. Plaintiffs move to strike the opinion of Defendants' expert, Robert Crandall. Because the scope and content of Crandall's opinion materially impacts the final certification analysis, the Court will turn its attention to that motion first so that the contours of the Court's analysis on final certification are established.

---

[8] As will be discussed in further detail in the consideration of the parties competing motions for certification and decertification, employees who are "similarly situated" may seek class certification under the FLSA. 29 U.S.C. § 216(b). The FLSA does not define the term "similarly situated" but several considerations inform the analysis, including "the extent to which any defenses that an employer might have to overtime or misclassification claims are common or individuated[.]" Big Lots Stores, Inc., 561 F. Supp. 2d at 573 (citation omitted).

## II.    Motion to Preclude Expert Robert Crandall

Plaintiffs move to strike Defendants' expert Robert Crandall pursuant to Daubert, 509 U.S. 579 and Fed. R. Evid. 702. Defendants offer Crandall as a labor studies and complex data analysis expert for the purpose of testifying to the daily work activities of ASMs in the Burlington Factory stores. The opt-in ASMs pursuing final certification aver that their activities were mischaracterized by Burlington as primarily performing managerial tasks which exempt them from overtime pay under the FLSA.[9]

To challenge that assertion, Robert Crandall and his team from Resolution Economics studied the work performed by ASMs on a daily basis in order to discern the percentage of Plaintiffs' primary duties that are managerial under the FLSA. Crandall created a time and motion study and employed a number of "observers" to study a random population of ASMs who did not elect to join the class. Crandall opines that his job was to study and make conclusions related to the following:

> 1) the amount of time Burlington ASMs spend performing managerial duties; 2) whether the data supports the theory that Burlington's policies, practices, procedures, training, and supervision resulted in ASMs spending uniform and consistent amounts of time on the various tasks they perform and managerial tasks in the aggregate, 3) what factors influence the tasks that ASMs perform; 4) how Burlington's business model influences the role of the ASMs; 5) whether data suggests that Burlington's expectations that the ASM position is managerial is reasonable;  and, 6) how my findings impact the use of representative testimony and statistical extrapolation in connection with class or collective certification and making merits determinations.

Crandall. Dec. 1:12-26.

---

[9] The opt-in Plaintiffs represent twenty-two percent of the ASM population at Burlington invited to join the class.

Crandall's team randomly selected a population of sixty ASMs to observe at various Burlington store locations, careful to avoid any opt-in Plaintiffs.[10] During the course of one work week, Crandall's observation team captured 246,000 work events during the 2,473 hours of observation of the ASMs. Crandall Decl. 3:20-23. Crandall's conclusions are detailed in his report. In general terms, Crandall concludes that the observed ASMs allocated more than 50% fifty percent of their work time to managerial duties, there is a wide variation in the percentage of time ASMs allocate to managerial/dual tasks on both a day-to-day and weekly basis, and that the different cultures, traffic and other attributes in each Burlington store make it difficult to predict the amount of managerial time spent by the ASMs as a whole. Id. at 4:1-2; Crandall Report at 3-9.

Plaintiffs move to preclude Crandall's report as unreliable under the dictates of Daubert.

A. Federal Rule of Evidence 702 and Daubert

The guiding principles that inform the Court's judgment are found in Federal Rule of Evidence 702 and Daubert, 509 U.S. 579. Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the

---

[10] In order to fashion the population of ASMs that would be observed, Crandall explained at the hearing that he first randomly selected several Burlington stores and then randomly selected managers within the stores. Hearing Tr., Dec. 8, 2015, 169:15-25. However, Crandall mistakenly observed one opt-in Darniel Williams, but Crandall agrees he does not have statistical information to make a comparison between Ms. Williams and the opt-in Plaintiffs. Crandall Dep. 215:20-216:8, 220-26.

> product of reliable principles and methods, and (3) the witness has applied
> the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Consistent with that Rule, Daubert established a "trilogy of restrictions" on the admissibility of expert testimony relating to scientific knowledge. See Calhoun v. Yamaha Motor Corp., 350 F.3d 316, 321 (3d Cir. 2003).[11] This "trilogy" consists of "qualification, reliability and fit." Id. Here, the issue is whether Crandall's opinions are reliable; there is no challenge to his qualification or to the fit of his testimony.

With respect to reliability, the focus is on the "principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. Four benchmarks help determine whether a theory or technique qualifies as "scientific knowledge" such that it will assist the trier of fact. See id. at 593. The Court considers: (1) whether the theory can be or has been tested; (2) whether the theory or technique has been subjected to peer review and/or publication; (3) the rate of error; and (4) whether the theory or technique has been generally accepted within the putative expert's respective community. Id. at 593-94. The Third Circuit adds other factors, including: (5) the existence and maintenance of standards controlling the technique's operation; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. In re Paoli R.R. Yard PCB, Litig., 35 F.3d 717, 742 n. 8 (3d Cir. 1994). When considering these factors, the Court's inquiry must be a "flexible one." Id.

---

[11] Daubert also applies to expert testimony relating to "technical or other specialized knowledge." See Oddi v. Ford Motor Corp., 234 F.3d 136, 146 (3d Cir. 2000) (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

9

The reliability factors are not exclusive. They "are intended to serve only as 'useful guideposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted.' " Yarchak v. Trek Bicycle Corp., 208 F. Supp. 2d 470, 495 D.N.J. 2002) (quoting Heller v. Shaw Industries, Inc., 167 F.3d 146, 152 (3d Cir. 1999)). With the help of these guideposts, the Court performs its essential gatekeeper role under Federal Rules of Evidence 702.

### B. Daubert Hearing

Rule 104(a) permits a preliminary inquiry in the form of a Daubert hearing, wherein the burden of proof on admissibility of an expert is set at a preponderance of the evidence. See Fed. R. Evid. 104(a); Daubert, 509 U.S. at 592 n.10 (referring to Rule 104(a) and holding that such preliminary "matters should be established by a preponderance of proof."). The Third Circuit stresses "the importance of *in limine* hearings under Rule 104(a) in making the reliability determination required under Rule 702 and Daubert." See In re TMI Litigation, 199 F.3d 158, 159 (3d Cir. 2000) (quoting Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 417 (3d Cir. 1999)). The importance of such a hearing is heightened when either party advances a Daubert challenge "in the context of a summary judgment motion or where summary judgment will inevitably be granted if the proffered evidence is excluded." In re TMI Litigation, 199 F.3d at 159. Fully aware that a "failure to hold [an *in limine*] hearing" in this context "may be an abuse of discretion," see id. (quoting Padillas, 186 F.3d at 418), this Court set aside three days for the above-mentioned Daubert challenges by way of Letter Order. (Letter Order [Dkt. Entry No. 393], filed Oct. 2, 2015).

C. Analysis

On December 8 and 9, 2015 and March 16 and 17, 2016, the Court conducted a
Daubert hearing and heard ensuing oral argument on the pending motions to, *inter alia*,
flush out concerns with Crandall's report. After consideration of the written
submissions, both pre and post hearings, and the testimony and arguments advanced at
the hearings, the Court finds that Crandall's report is generally reliable, but also
unreliable in part as follows.

Plaintiffs object to Crandall's testimony for several reasons. First, Plaintiffs
complain that Crandall's study did not include observation of any of the opt-in Plaintiffs
and is inherently unreliable because it considers the wrong universe of workers.
Second, Plaintiffs argue that Crandall's Report is unreliable because his methodology
cannot support his conclusion that more than 50% percent of the ASMs' activities are
managerial, is based upon speculation, lacks sufficient foundational evidence and
information to support his conclusions, and has not been subject to peer review.

After consideration of the expert report, the testimony offered and arguments
cultivated during the many hours of the Daubert hearing and subsequent oral argument,
and the thorough written submissions of the parties, Plaintiffs' motion is granted as it
relates to Crandall's penultimate conclusion that ASMs perform managerial work a
majority of the time and denied as to all other claims of unreliability. Specifically, the
Court finds that Mr. Crandall cannot opine that certain tasks are indicative of
management because such conclusions lack sufficient foundational evidence and
information to support his findings. However, the Court finds that Crandall's method

has been subject to peer review and is generally accepted in the field. In addition, Plaintiffs' claim that Crandall observed the wrong population of workers, who are not part of the class, is without merit. The findings as to the population observed are sufficiently reliable to inform the potential behavior of the opt-in Plaintiffs.

Crandall's observations of the sample population are not inherently unreliable simply because the observed ASMs chose, for whatever reason, not to opt into the class. Plaintiffs' chief argument in support of final certification is that Burlington's comprehensive corporate policies and procedures define the job duties of the ASMs and tilt in favor of a finding that the ASMs are similarly situated.[12] Using that barometer of similarity, observation of ASMs, even those who did not choose to opt-in, is informative and has the sufficient hallmarks of a reliable study. See Big Lots Stores, Inc., 561 F. Supp. 2d at 587 (rejecting plaintiffs' argument that "consideration of evidence from non-opt-in ASMs who hold the same ASM job position was improper because they were unrepresentative[.]").

The Third Circuit classified several characteristics as indicative of a properly conducted survey:

> A proper universe must be examined and a representative sample must be chosen; the persons conducting the survey must be experts; the data must be properly gathered and accurately reported. It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques. Just as important, the survey must be conducted independently of the attorneys involved in the litigation. The interviewers or sample designers should, of course, be trained, and ideally should be unaware of the purpose of the survey or the litigation.

---

[12] The Court recognizes that Plaintiffs' argument in this regard is more nuanced, as will be discussed in further detail in consideration of the motions to certify/decertify.

Pittsburgh Press Club v. United States, 579 F.2d 751, 758 (3d Cir. 1978) (citing Judicial Conference Study Group, Handbook of Recommended Procedures for the Trial of Protracted Litigation, 25 F.R.D. 351, 429 (1960)).

These considerations "are non-exclusive, but it remains essential to consider whether the population and terms were properly defined, whether the design, questionnaires, and interviews met objective standards, whether data was accurately collected and reported, whether data was properly analyzed, whether the questions asked were unrelated to the material issues of the case, whether questions were unfairly leading, and whether questions were confusing." J & J Snack Foods, Corp. v. Earthgrains Co., 220 F. Supp. 2d 358, 369 (D.N.J. 2002) (citing 4 Weinstein's Federal Evidence § 702.06). Under well-established statistical principles, the differences between the studied population and the target population must be not be too great so as to render the conclusions unreliable, and therefore inadmissible. See Citizens Fin. Grp., 383 F.3d at 121 (3d Cir. 2004) ("A survey of the wrong 'universe' will be of little probative value in litigation.").

Crandall's study satisfies a majority of the considerations identified in Pittsburgh Press Club, 579 F.2d at 758. Crandall utilized trained observers to objectively survey a representative population of workers who labor under the same corporate policies, procedures and training schemes as the opt-in ASMs. The variations identified by Crandall in the day-to-day achievement of the duties does not render his findings unreliable as to the opt-in Plaintiffs, who complain that their labor is less managerial in nature. Courts in this Circuit have permitted behavioral evidence of populations that are not part of the proposed class as reliable evidence against an opt-in subset of that population. See, e.g., Resch v. Krapfs Coaches, Inc., Civil Action No. 11–6893, 2013 WL

13

4603011, at *6 (E.D .Pa. Aug. 29, 2013) ("[D]efendant does not need to prove that each plaintiff drove interstate regularly, or even that they have driven interstate at all; instead, defendant must simply prove that 'because of company policy and activity, the driver could reasonably be expected to do interstate driving.' "); Mendez v. Avis Budget Group. Inc., Case No. 11-6537 (JLL), 2017 WL 2672074 (D.N.J. June 21, 2017) (rejecting the argument that the expert was required to address each way an e-Toll surcharge might have been disclosed, and concluding that those arguments go to the weight, as opposed to the admissibility, of the opinion).

Crandall's findings as being based upon a class of individuals not named in the present matter are subject to scrutiny, but in this instance, such challenges go to the weight and value, not the inherent reliability. Crandall himself admits that his findings as to the sample population may not necessarily inform the experience of the opt-ins.

Q. Are [the opt-ins] the exception to the rule and how many might fall in one category versus the other as you use the terms "rule" and "exception."

A. I can't give you an estimate of how many would fall into any category at this point because I do not have a listing of all their claimed experiences and how they estimated their time. I've not evaluated whether or not they have provided reliable estimates. And if I had such information, I would then statistically compare their claims to the distribution of outcomes and from there I can make a determination.

Crandall Dep. 526:6-531:7.

Crandall also agrees that he lacks data on opt-ins to make a comparison to the sample population of ASMs:

Q. With respect to Exhibit 2 [relating to one of the two constituent groups of ASMs] –

A. Yes.

14

Q. – which you did open to, have you conducted any tests to determine whether if you sampled the opt-in ASMs, you would get 53.8 percent managerial in your determination?

...

Q. But would you expect to see the number – the number of 53.8 managerial?

A. I wouldn't be surprised to see that number.

Q. Have you tested to see whether that would be the case?

A. Are you asking have I connected [sic] a study of opt-ins? I haven't conducted a study of opt-ins.

...

Q. So you did not conduct any tests that would determine whether you would get a similar chart to Exhibit 2 or whether the numbers might look wildly different?

A. I would be surprised if the numbers are wildly different. This is on the course of looking at, for example, Exhibit 2, 1000 – looks like 271 hours without my glasses on. It's pretty close to that. You know, that's a lot of time and that's a lot of people that went into this. And so I think this is certainly representative of the diversities of experience you would expect to see and I would expect these numbers to be that way, yes.

Q. That is your expectation. My question was have you run any tests.

A. Have I compared two data sets?

Q. Correct.

A. There is no opt-in data set to compare it to.

...

Q. You do not have the data set available to conduct that test, correct?

A. I have not – I could have conducted any data set of opt-in differences. I have not conducted those.

Id. at 224:5-227:5.

The Court finds that Crandall's study is reliable as it relates to the methodology of observing ASMs who did not opt-in to the class because the observation of ASMs laboring under the same protocols governing the opt-in class, even with variation in the manner in which ASMs perform their duties, is useful and relevant to the questions

15

before the Court. See Butler v. American Cable & Telephone, LLC, No. 09-CV-5336, 2011 WL 2708399 (N.D. Ill. July 12, 2011) (finding the fact that "Crandall did not interview the putative class members or take their testimony into account does not require a finding that his methodology is flawed"); Casida v. Sears Holdings Corp., No. 1:11-CV-01052 AWI, 2012 WL 3260423, at *5 (E.D. Cal. Aug. 8, 2012), report and recommendation adopted, No. 1:11-CV-01052-AWI, 2012 WL 3763621 (E.D. Cal. Aug. 29, 2012) (stating that plaintiff's argument seeking to limit Crandall's Report because it observed non-members of the putative class "flies in the face of [the] overall argument" of similarity of the class). Even if Crandall's lack of comparison data for the opt-in class can be deemed a deficiency, it is not enough to undermine the admissibility of the study. Once the deficiencies of a study are taken into account, expert testimony is admissible if it is useful, reliable, and probative, as it is the present circumstances. J & J Snack Foods, Corp., 220 F. Supp. at 369–70.

Here, the corporate policies, training, and procedures dictate expected behavior among the ASMs. The Court finds that Crandall's attempt to extrapolate conclusions based upon a sample population of ASMs who chose not to opt-in to inform the expected behavior of the opt-in class is admissible, useful, and reliable. Attacks on Crandall's methodology in this regard go to the weight of his conclusions, not the admissibility. "The test of admissibility is not whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research." In re TMI Litig., 193 F.3d 613, 703-04 (3d Cir. 1999), amended, 199 F.3d 158 (3d Cir. 2000); Karlo v. Pittsburgh Glass Works, LLC, 849 F.3d 61, 81 (3d Cir. 2017) (The standard for reliability is "not that high," but is "lower than the

16

merits standard of correctness.") (quoting In re TM! Litig, 193 F.3d at 703-704).
Plaintiffs' motion is denied on this ground.

However, as to Plaintiffs' second argument, Crandall's conclusions set forth in
Paragraphs 96, 97, and 98 of his report, which state in general terms that the ASMs
spend more than half their time performing managerial duties and that the nature of
the tasks performed in that time is too variant to permit class certification, lacks
foundation and is an impermissible legal conclusion. Plaintiffs attack Crandall's
methodology, lack of foundational evidence, and the contours of the study. Plaintiffs'
chief complaints with Crandall's methodology is it lacks peer-review and/or is not
recognized within his field of study. In addition, Crandall designed his study and set
out descriptions of activities as managerial, which pigeonholed his observation team in
determining the nature of the tasks observed. Furthermore, Crandall's the use of
"continuous job shadowing" was devoid of critical interaction with the population and
cannot support his opinions regarding the amount of time the ASMs engaged in
managerial tasks. The Court agrees that Crandall's ultimate conclusions are predicated
upon impermissible speculation and assumption in part and are therefore inadmissible.
Crandall may, however, testify as to what was observed, the manner in which it was
coded and classified as managerial, non-managerial, and dual; but he cannot make the
ultimate conclusion that the duties of the ASMs are primarily managerial and/or are too
varied to preclude class certification.

The federal regulations implementing the FLSA define "management" to include
activities such as:

[I]nterviewing, selecting, and training of employees . . . directing
the work of employees; ... appraising employees' productivity and
efficiency for the purpose of recommending promotions or other changes

17

in status; disciplining employees; ... apportioning the work among the employees; ... [and] providing for the safety and security of the employees or the property....

29 C.F.R. § 541.102. Itterly v. Family Dollar Stores, Inc., 606 F. App'x 643, 645–46 (3d Cir. 2015). An employee need not spend the majority of his work time doing managerial tasks to be properly considered a manager under the FLSA. Id. Thus, time spent "performing nonexempt tasks such as unloading freight, stocking shelves, and ringing a register" can outweigh daily "managerial" tasks without undermining management as the employee's "primary duty." Id.; see also, Guthrie v. Lady Jane Collieries, Inc., 722 F.2d 1141 (3d Cir. 1983) (holding that foremen who spent no more than 44% of their time performing managerial work were exempt executives under the FLSA).

Section 541.700(b) of the C.F.R. states that "time [allocation] alone . . . is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work." Id. The standard considers the importance of the managerial function as compared to employee's other nonexempt duties. Thus, the test is "whether the management activities are critical to the successful operation of the enterprise." Guthrie, 722 F.2d at 1145 (citing Donovan v. Burger King Corp., 675 F.2d 516, 521 (2d Cir. 1982)).

Crandall created a time and motion style study to access the nature of the work performed by the ASMs without disrupting the organic working environment.[13] Among

---

[13] According to Crandall, there are several firms that perform time and motion studies in retail, manufacturing and hospitals, including Berkeley Research Group, FTI, and Mackenzie, to name a few. Hearing Tr. Dec 9, 2015 at 75:16-21; 171:18-23. A review of the caselaw suggests that time and motion studies are regularly performed and admissible in FLSA cases. See e.g., Casida, No. 1:11-CV-01052, 2012 WL 3260423; Martinez-Hernandez v. Butterball, L.L.C., No. 5:07-CV-174-H, 2011 WL 4460332, at *5 (E.D.N.C. Sept. 26, 2011), Gilbert v. Citigroup, Inc, No. C 08-0385 SC, 2009 WL 10692463, at *1 (N.D. Cal. Apr. 2, 2009), Stillman v. Staples, Inc., No. 07-CV-849, 2009 WL 1437817, at *10 (D.N.J. May 15, 2009).

many factors, the study considers position of the subject, time, movement, and customer flow of the retail store at the time, in order to the manner in which work productivity is achieved.[14] Crandall describes the undertaking in his Report as follows:

> Under this approach, observers were tasked with "shadowing" the subject throughout the workday. Each time the ASM performed a different task, the observer would push a button associated with the activity and the area of the store where the activity was performed. Every time a button was pushed, a record was created in the database, which recorded the activity, location in the store, start time, and duration. For example, suppose an ASM were observed performing the following sequence: work on scheduling in the office, walk on the sales floor to the back room, interact with an employee, and walk back across the sales floor to the office. In this example, the ASM spent time in three separate areas of the store. First, the ASM was in the "office", then he or she was on the "sales floor", and then he or she was in the "back room." He or she also performed three separate tasks-scheduling, travel, and employee interaction. Using this approach, Resolution Economics observers captured over 246,000 work events while observing approximately 2,473 hours of ASM work time.

Crandall Rep. 5:12-23; Hearing Tr., Dec. 9, 2015 at 85:5- 88:17.

Crandall's report categorizes tasks as being in one of three primary groups: "managerial," "non-managerial," or "dual" in nature. Id. 5:4-16.[15] The categories of tasks

---

[14] In addition to time and motion studies, Crandall estimates he is the foremost expert in the country who served corporations, including retailers in examining timekeeping and payroll data, staffing practices, and labor models to "help retailers figure out how much labor should happen and when that labor should be on duty." Hearing Tr., Dec 9, 2015 at 73:1-3. Crandall also performs staffing analyses and consults on payment compliancy under the FLSA and state laws. Id. at 4-18. Often the examination implicates large record data sets. Id. at 74:4-7. Crandall agrees that most of his work centers on "determining issues related to exemptions." Id.at 74:16-17.

[15] The report details the categorizations as follows:

> For purposes of the analyses reported here in, tasks were categorized as being managerial, non- managerial, or "dual" in nature. "Dual" tasks are tasks that were identified as non-managerial in the statistics reported above, but have the potential for being managerial or non-managerial depending on the ASMs' intent as he or she performed the task. For example, suppose an ASM was observed stocking alongside an associate. The ASM's intent could be to train the associate, it could be to coach or motivate the associate to work at a faster pace, or it could be that the ASM's intent is simply to stock. Since the observer was instructed to avoid communicating with the ASM, the observer could not inquire as to why the ASM was performing the task. While the study protocols prevented the observer from making inquiries about ASM intent, the study did separately identify "dual" task categories for instances where ASMs were performing non-managerial tasks alongside one or more associates.

Id. at 4:21-26, n.4.

are further broken down into sub tasks as set forth in Attachment B to Crandall's Report. The numerous tasks and sub tasks were preselected and designated by Crandall into the primary three categories. Crandall offers the following example of the interplay of the tasks in his Report:

> Suppose an ASM was observed performing the following sequence: work on scheduling in the office, walk on the sales floor to the back room, and walk back across the sales floor to the office... He or she performed three separate tasks –scheduling, travel, and employee interaction.
> Crandall Report at 3.

Applying the structure set out in Attachment B to Crandall's Report, there are a number of ways this example could be coded to reflect the activity as managerial; but without more information, it is difficult to say with any certainty that all of the tasks are in fact managerial.

To be admissible, an expert report must rest upon "the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003) (quoting Daubert, 509 U.S. at 589); Edmond v. Plainfield Bd. of Educ., No. 11-CV-2805, 2018 WL 4380991, at *5 (D.N.J. Sept. 13, 2018) (striking expert testimony where it was "entirely unclear what methodology [the expert] employed, and whether such methodology has been reviewed or accepted by the psychiatric community"); see also Kemly v. Werner Co., 151 F. Supp. 3d 496, 502 (D.N.J. 2015) (describing the analytical requirements for admissibility).

Plaintiffs' expert, Dr. Mark R. Killingsworth[16] opines that Crandall's conclusions finding that the ASMs engage in primarily managerial work lack the necessary information to formulate his categorization of tasks as managerial:

---

[16] Dr. Mark R Killingsworth is a full-time professor of economics and the former chairman of the Department of Economics at Rutgers University. Defendants have not challenged the Opinion and Report of Dr. Killingsworth by way of motion.

In sum, during his deposition, Mr. Crandall was repeatedly asked to
provide evidence to support his classification of various tasks as
"managerial," but was never able to do so. (I cannot find any such evidence
in his declaration or his data). Instead, repeatedly, he answered by
referring to his suppositions and assumptions. Of course, that is not
proper statistical analysis and would not support the publication of a
paper or peer-reviewed journal.

Killingsworth Report 6-7.

Killingsworth also casts dispersions on Mr. Crandall's design of the study as

running afoul of established principles of statistics because of the conclusions Crandall

draws from the observations.

[The report] fails to adhere to the most basic principles of statistical
inference, and cannot provide any meaningful information on the opt-ins
(both inactive and active) who are the subject of this litigation. For this
reason, I believe that, if submitted to a peer-reviewed journal, the analyses
in this declaration would be summarily rejected.

Id.

The Court finds that Crandall's ultimate conclusion that Defendants'

classification of the opt-ins as "exempt" is reasonable, because of the amount of time

Crandall claims the non-opt-in plaintiffs spent on managerial tasks, is unreliable

because he lacks context for certain observations. Several examples highlight the

tension in Crandall's Report. First, Crandall's task labeled "Monitor/supervise while

stationary and while moving," was used to designate approximately 338 hours of ASM

time as "managerial" for observations of ASMs either walking or standing idle. Crandall

Dep. at 509:11-510:3; 58:7-59:4; 72:8-73:5; 493:13-495:4; 508:1-509:9. Crandall

explained during deposition:

Q. Let's move to the next category, which is again Monitor/Travel,
this time Monitor/Supervise, which means standing in one place, correct?
A. That's correct....

Q. Is it not true, to cut through this, that all you know from your data is that she was standing stationary with her eyes open?

A. I do not know her thought process when she's standing there. I would assume that she was trying to fulfill the expectations of the job of manager when she was there, and that carries certain connotations when you're in the store monitoring or traveling about. Id. at 509:11-510:3.

Here, Crandall is forced to admit an assumption about thought process because the data is lacking.[17] A second example considers purpose of the movement of the accidentally-observed opt-in Plaintiff Daniels:

Q. When you say that Ms. Williams spent 8.9 percent of her time as task 01b Monitor/Travel, Travel, please provide me greater specificity as to what she was doing during that time.

A. She was traveling around the store to whatever next activity she performed....

Q. What did Ms. Williams do in those two and a half hours? Do you know that, or do you not know that?

A. Are you asking did I read her mind about what she was doing?

Q. I will take that. Did you read her mind as to what she was doing?

A. We did not read her mind.

Id. at 493:13-494:21.

Because the observers on Crandall's team did not record additional indicia of the task, Crandall was forced to admit that he lacked data to explain Daniels' intent, purpose, or thought process as she walked from place to place in the store or were simply stationary.[18]

Finally, another example given by Crandall is an observation of an ASM stocking merchandise alongside an associate coded as managerial because of the potential that

---

[17] Crandall attempts to rehabilitate his conclusions in a post-hearing Declaration. [Dkt. No. 368]. While some of Crandall's submissions sound in legal argument, he clarifies his decision to forgo computation of conversations because the context of the conversations, the purpose of the movement, and the posture of the worker was considered by the observer as relevant to the code punched. As a result, Crandall contends that the classification of the events recorded is reliable. Crandall Supp. Decl, March 3, 2015, 3:17-4:15. Such argument is properly considered by the jury.

[18] A similar argument relates to time Crandall coded as "huddling" and reading emails. See Crandall Dep. 278:4-282:14. A similar level of speculation is necessary because there is no recordation of the conversation in the huddle style meeting of the employees or the content of the email being reviewed.

the ASM was training the associate, rather than merely helping to accomplish the task. Hearing Trs. Dec. 8, 2019, 124:11-125:11, Dec.9, 2015, 101:7-103:25. Crandall speculates that the ASMs' intent could be to train the associate (managerial), it could be to coach or motivate the associate to work at a faster pace (managerial), or it could be that the ASMs intent is simply to stock (non-managerial). Id.

In all of these examples, the data shows where the ASM is physically and identifies variations in the manner in which the ASM spends time. The statistical leap occurs when Crandall surmises that the ASM is acting in managerial capacity when, for example, she works alongside a nonexempt associate on a non-managerial task. Without talking to the ASM or obtaining declarations, there is no way, other than to guess, what the purpose of the ASM's activities are; they could be passively managing by setting the example for training purposes or they could just be accomplishing restocking the shelves.

One reason for this gap is that Crandall's observation teams purposefully avoided communicating with the ASM, did not inquire as to why the ASM was performing the task, and did not review any declarations from the observed ASM. Hearing Tr. Dec. 8, 2015 77:21-25. This sets the present case apart from other studies executed by Crandall where he had employee input to give context to the data.

In Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33, 49 (S.D.N.Y. 2016), Crandall offered rebuttal expert testimony to challenge plaintiffs' assertion that they were misclassified as FLSA exempt. Crandall's review included digesting the company's own data and reviewing plaintiffs' declarations. The challenge to his report was premised upon plaintiffs' claim that Crandall's report "impermissibly weaves legal arguments and legal conclusions into his analysis, placing himself in the role of

23

advocate and trier of fact." Id. The Court agreed and precluded Crandall from testifying about what conclusions could be drawn from the evidence gathered. Id.

In addition to corporate reviews performed in Chipotle, Crandall has done numerous time-motion studies; the difference here is that he has no store provided data to compliment his findings and/or to help put the observations into context. See Crandall Curriculum Vitae, Crandall Report, Attachment A. The study here does not include any information on what the observers were able to hear in certain interactions because they did not record what was said. Thus, the observation team surmised that the activity and conversations were managerial because the work may fit certain categories based upon posture and the potential ability to hear some conversation.

> Q. And you had about -- did you have 60 observers studying the 60 people or 15 observers?
> A. Probably 10 or 11.
> Q. Okay. 10 or 11, okay. And every 10 or -- the 10 or 11 observers were specifically instructed that when you're shadowing somebody, you've got to stay far enough away to avoid any unnecessary interaction, right?
> A. That's correct. We try not to -- to interject ourselves in the process.
> Q. To the answer is, you've told them to stay far enough away to avoid any unnecessary interaction, right?
> A. Well, it's nuanced. It's far enough away to avoid interaction, unnecessary interaction, but also close enough, within earshot to hear conversations so you can code the conversations.

Crandall Dec. 8-9, Transcript 77-78.

There is debate in the record about whether the observers were trained to consider the conversation of the interactions they observed to inform the coding. The training manual provided to the observers did not include directions for the observers to stand close enough to actually hear the conversations, so what they heard is subject to scrutiny.

Q. And you would agree with me that in the training guide, in the 18 pages of training guide, there's not one single word about standing close enough to hear a conversation. Can you and I agree to that?

A. Well, if you pull the training guide, that's how we train people in stores.

Q. Sir, can you and I agree -- it's a very simple question. There's a training guide you wrote, you sent to us, we read, and there's not a single word in the 18 pages of training guide about standing close enough to an ASM to hear a conversation. Yes or no?

*  *  *

Q.-- to refresh your recollection. And is there a single word in there, or a single sentence in there, about standing close enough to hear conversation, yes or no?

Q. It was very simple, the question was very simple. The question was, please, go into your 18-page training guard -- guide and tell me where it says or instructs the 10 or 11 observers to stand close enough to hear a conversation.

A. It says -- that's why I was trying to read it for you, sir: "Observe his or her activity at a distance that allows you to observe and understand what activities are being performed." And part of our protocol is to code conversations as business related or nonbusiness related. So if you're doing that you have to be within earshot.

Q. So there's nothing in there that uses the words "stand close enough to hear a conversation," right?

A. It doesn't say that explicitly, but that's part of the protocol, and so to do that, and code the activities, you have to.

Id. at 77-80:25

However, Crandall testified during the hearing that the on-site training included directions to capture the essence of the discussion so that the observers could properly code the observation.

THE COURT: See, let me see if I could understand and you could clarify this, if I'm wrong, the essence of the discussion. By what you're indicating is that in order to conduct your study, that people are to be observing others in their activities and be close enough to be able to monitor their activities. All right. Now, that's what the policy appears to be. Is it in your training that you tell them to be close enough to actually hear the conversations to make sure the conversations are in keeping with their work assignments?

THE WITNESS: That's correct, Your Honor, we train them on that.

25

THE COURT: All right. But it's not contained verbally in the policy, part of the training?

THE WITNESS: Well, we do multiple training. We do onsite training where we're actually doing the observations during the pretest, and part of that is how far away do you have to be, for example, if someone goes in the office, you're probably going to be a lot closer because the proximity is much smaller, to be able to see what they're doing. If you're 10 or 15 feet away on the sales floor, for example, I don't have to stand right next to you to hear you talking to a customer. But if you come up to the somebody, I've got to be close enough to hear the conversation because I have to code it as an activity, is it business related or nonbusiness related.

THE COURT: So you have to be close enough to be able to understand what they're saying to see whether it's business related, but not so close as to be intrusive?

THE WITNESS: Exactly, Your Honor.

Id. 87:16-25- 88:25.

Finally, Crandall's report does not mention the conversations as a factor in the coding.

Observers made contemporaneous records of changes in ASMs' activities by tapping a button on a computerized device when a task started, and then tapping a different button when the next task began. In each instance a button was pushed, what the task was, as well as its duration, were recorded. The task list contained a total of 645 unique tasks identified. In the software utilized by the observers, the tasks were arranged in a series of sub-menu pages to facilitate the coding process, which will be described in more detail below. The task list was developed during the planning phase of the study. First, documents provided by Burlington, such as job descriptions, were reviewed. Then, Store Managers in the pilot stores in Nevada, as described below, were interviewed and asked about what tasks CSLMs and MMs typically perform. The task list constructed from these document reviews and interviews was used as the basis for the observation study.

Crandall Report, 13:5-15.

Under either scenario, the information Crandall and his team relied upon to make his conclusions leaves too much room for speculation or assumption in certain instances, differentiating it from that in Chipotle, where Crandall considered employer data and employee declarations, which provided context to the employer data. Here, Crandall has no evidence of the purpose or intent of some of the activities observed. He has recordings of observed activity and time spent. Recordation of physical activity, such as walking, talking to associates and other managers, and observing without information on the context of conversations is insufficient to conclude that the purpose or intent of the action is managerial. Unrecorded conversations between two people at work, regardless of their hierarchal relationship, could be anything from friendly small talk, to mentoring, to managing.

In short, Crandall's ultimate conclusion is premised upon a level of assumption and speculation. In this regard, the observers collected insufficient information to make the conclusion that the acts were in fact "primarily managerial." Crandall can opine as to what was observed, how much time was spent on each observation, and the training of the observers making the coding determination, but the gap in observation and unsupported speculation is too great to lend reliability to Crandall's overall conclusions that the work is primarily managerial. Thus, while Crandall may say what he observed and where he observed it or how much time was spent in a particular working posture and physical location, he cannot opine on the mere possibility that "managerial" activity is presents during task working.

Finally, Plaintiffs attack Crandall's methodology because he fails to set out any authority for the Court to consider so as to make a comparison between Crandall's study and generally accepted studies within the field. While Crandall acknowledges

27

competitors in his field use similar studies to evaluate claims, he admits there is no

"apples to apples" comparison. In essence, his study and methods stand alone.

Killingsworth opines that Mr. Crandall's design of the study runs afoul of

established principles of statistics, rendering the study's applicability to the opt-ins as

problematic because of the legal conclusion Crandall draws from the findings.

> [The report] fails to adhere to the most basic principles of statistical
> inference, and cannot provide any meaningful information on the opt-ins
> (both inactive and active) who are the subject of this litigation. For this
> reason, I believe that, if submitted to a peer-reviewed journal, the analyses
> in this declaration would be summarily rejected.

Killingsworth Report, Ex. E., p. 3.

According to Killingsworth, Crandall's design of the study also fails to meet the

standards for publication in a peer-reviewed journal. Id. During the hearing on

December 9, 2015, the Court pressed Crandall on his time motion methodology as it

pertains to retail managers and its acceptance in his field of study:

> THE COURT: From my understanding of the way this question has
> been asked several times, is that there is no recognized authority in the
> field that touches upon this subject matter specifically.
> THE WITNESS: That's the basic problem. There are time-and-
> motion studies, Your Honor, that are in hospital environments. There are
> time-and-motion studies that are in manufacturing environments. There
> are industrial engineers that are thinking about, you know, how much time
> is spent to grasp this or how do we rearrange a process. So they're used in
> so many different environments, you know, you could have a publication
> like one that was shown to me earlier, that deals with line workers and
> manufacture, you know, so you would want to look at the context that's
> there, and the difference is, academics don't have the resources to study this
> kind of task.
> THE COURT: No, I understand that's been your answer, but I guess
> for my purpose would be this. If you're confronted by testimony from two
> experts, like I eventually will be, is there anything written out there as an
> authority that I could use to determine the accuracy of either side of the
> equation, specifically to the questions being asked?
> THE WITNESS: There's no study that is a published authority that
> would deal with retail managers, FLSA, that I'm aware of.

Hearing, 12/9/15 at 171:14-172:13.

Crandall also acknowledged that he did not cite to, or necessarily follow, the

methodology employed by his competitors or any other authority, despite his

protestations that his study followed "generally-accepted methodology." Id. at 172:24-

25. In short, he testified that there is nothing for the Court to rely upon in evaluating his

methodology.

> THE COURT: So I have nothing I can look to and say this supports this
> and this supports that.
> THE WITNESS: There is no publication that says this is how you do it
> because the people that do these studies are consultants, not academics.
> We are not trying to insert things in the journals.
> THE COURT: No, I understand that. So then what I'm left with is looking
> to see the weight and strength of each of the opinions and have nothing
> else to use as a crutch, other than what should be why I'm getting paid the
> big bucks. Is that what you're saying? (Laughter.)
> THE WITNESS: I think Your Honor is -- yes, I agree that you have to look
> at the relative qualifications, the experience of the two experts in this
> doing these types of studies and you'd have to weigh that evidence.
> THE COURT: And see the basis upon which they arrive at their
> conclusions to see if there is a foundation that we can lean on one way or
> the other.

Id. at 177:8-19.

The Court further clarified and confirmed that some of the conclusions

require an acceptance of Crandall's authority to make them:

> The Court: What I'm left here then is the weight and reliability of each
> of the opinions without something to then lean on beyond my own
> feelings of what the testimony was here.
> The Witness: Unfortunately, Your Honor, I think that your
> assessment is correct.

Id. at 179:10-13

The Court finds that Crandall's conclusions are the product of a reliable methodology. As noted in n.13 supra., time and motion studies are performed in a variety FLSA related data collection by a multitude of firms. Courts have considered Crandall's studies and data collection methodologies in other contexts as reliable. See Casida, 2012 WL 3260423, 5-6; Howard v. CVS Caremark Corp., No. 13-CV-4748, 2014 WL 7877404, 9, n.7 (C.D. Cal. Dec. 9, 2014); In re FedEx Ground Package System, Inc Employment Practices Litigation, No. 05-MD-527, 2007 WL 3027405 (N.D. Ind. Oct. 15, 2007) (all recognizing Crandall's methodology as reliable given his levels of education and experience).

In addition, under Rule 702, an expert's methodology may be informed by "personal knowledge or experience." Kumho, 526 U.S. at 150; see also United States v. Ford, 481 F.3d 215, 219 (3d Cir. 2007); Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc., 546 F. Supp. 2d 155, 165 (D.N.J. 2008) (experts can testify based upon personal experience). While Crandall's methodology is subject to challenge on cross-examination, the Court finds that it is acceptable and admissible.

### III.  Conclusion

For the reasons stated above, Plaintiffs' Motion to Preclude Robert Crandall is denied in part and granted in part. Crandall's conclusion that the ASMs "spend more than half their time performing managerial duties spend more than half their time performing managerial duties" is unreliable. Ruggiero v. Yamaha Motor Corporation, 2017 U.S. LEXIS 213635 (Dec. 29, 2017) ("Speculation is not methodology."). Specifically, the Court finds that Crandall's conclusions as set forth in Paragraph 96 are unreliable.

96.     As discussed in detail above, the data shows that on average CSLMs and MMs spend more than half their time performing managerial duties. Thus, the observation study data suggests that Burlington's belief that CSLMs and MMs principally perform managerial work so as to be appropriately classified as exempt is reasonable.

In addition, the underlined parts of Paragraphs 97 and 98 must be stricken as unreliable.

97.     The wide variation in the percentage of time allocated to various managerial, dual, and non-managerial _tasks contradicts the contention that Burlington's policies, practices, procedures, training, and supervision resulted in ASMs spending uniform and consistent amounts of time on the various tasks they perform and managerial tasks in the aggregate._

98.     Statistical analysis of the observation study data shows than known factors, such as store size, sales volume, and manager tenure are not correlated with the percentage of time spent on managerial duties. Thus, the data indicates that individualized factors such as personal preferences and managerial skill and style, as well as store specific factors such as labor volume drivers and employee productivity are the key factors that influence the tasks that ASMs perform and how much time they allocate to those tasks. _The wide variation in experiences means that any attempt to extrapolate the experiences of individuals who have been studied in detail to "absent" ASMs is likely to result in significant error. Therefore, individualized inquiry would be required in order to make accurate determinations regarding the amounts of time "absent" ASMs allocate to specific tasks and managerial tasks overall._

Accordingly, Crandall may testify as to the contours, methods and findings of his study. As such, Crandall is free to testify that such observations were made, where they were made, that they were coded as managerial, and the basis for that coding. He cannot, however, opine on the ultimate conclusions set forth in Paragraphs 96, 97, and 98 of his Report, as indicated, because such conclusions rest, in part, upon speculation and assumption related to activities ASMs engage in when they walk, talk, review emails, attend meetings, and generally look out at the sales floor in an observational

manner. The percentage of time spent on these types of activities cannot be included in his determination that ASMs perform managerial tasks more than half of the time they are working.

Plaintiffs' recourse, in this regard is to challenge the remainder of Crandall's testimony on cross-examination and attempt impeachment through the testimony of Killingsworth. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596 (citation omitted). The jury will consider which evidence to accept or reject.

An appropriate Order shall issue.

Dated: September 9th 2019

Hon. Joseph H. Rodriguez,
UNITED STATES DISTRICT JUDGE